**FAIRBANKS, MORSE & CO. v. HARRISON,**
Collector of Internal Revenue
(two cases).

**MUNICIPAL ACCEPTANCE CORPORA-
TION v. SAME (two cases).**

Nos. 4828, 44C1568, 4829, 44C1442; Consol.
No. 4828.

District Court, N. D. Illinois, E. D.
Dec. 13, 1945.

Poppenhusen, Johnston, Thompson & Raymond, of Chicago, Ill., for plaintiffs.

J. Albert Woll, U. S. Atty., of Chicago, Ill., Hon. Samuel O. Clark, Jr., Asst. Atty. Gen., Andrew D. Sharpe and George J. Laikin, Sp. Assts. to Atty. Gen., and John B. Stephan, Asst. U. S. Atty., of Chicago, Ill., for defendant.

CAMPBELL, District Judge.

This is a consolidated action involving four separate suits for the recovery of federal income and excess profits taxes:

### Cause No. 4828.

On November 6, 1942, plaintiff, Fairbanks, Morse & Company, a corporation, filed its complaint in two counts. The first count alleges that on July 13, 1937, this plaintiff filed its income and excess profits tax return reporting an income tax liability of $355,774.76, which was duly paid. In reporting its gross income for the year 1936, the plaintiff claimed a deduction of $188,722.22 as a bad debt loss. This amount is claimed as the balance left due and owing to the plaintiff from Fairbanks, Morse Home Appliances, Inc., a corporation (whose stock was wholly owned by the plaintiff), after the complete liquidation and dissolution of the subsidiary corporation during 1936 and the application of its remaining assets to the partial payment of its open account with the plaintiff. In this count it is also alleged that plaintiff claimed a loss in its 1936 tax return of $7,110 which represented the cost to it of the capital stock of the subsidiary. Subsequently, the Commissioner disallowed these deductions and assessed additional tax and interest against the plaintiff in the sum of $82,444.10, which plaintiff paid. This assessment included an additional tax and interest thereon of $57,893.06 on the plaintiff's reduced claim of $128,466.63 as bad debt and investment loss in the subsidiary. Plaintiff contends that the bad debt and investment loss is properly deductible from gross income under Section 23(f) of the Revenue Act of 1936, 26 U.S.C.A. Int. Rev. Code, § 23(f), and now seeks to recover the tax that was assessed and paid on this amount.

In the same count, the plaintiff alleges that in its tax return for the year 1936, it failed to exclude from gross income the sum of $12,101.54 which it received in that year on bad debts that had previously been charged off in the tax years of 1931, 1932, and 1933. It is alleged that the charge offs did not result in tax benefit to the plaintiff because of large losses sustained in those years. Recovery is sought under what plaintiff contends to be an established principle of law as well as under Section 116 of the Revenue Act of 1942 which amended Section 22(b) of the Internal Revenue Code, 26 U.S.C.A. Int. Rev. Acts.

Also in the first count in Case No. 4828 plaintiff alleges that in its tax return for 1936 it failed to exclude from its gross income the sum of $24,645.98 which it received in 1936 as tax exempt interest on obligations of municipalities and other political subdivisions of the various states; that these obligations consisted of notes, warrants, certificates, bonds and other instruments executed and delivered by said municipalities and political subdivisions to the plaintiff in payment of the purchase price for machinery and equipment which they had bought, installed, operated and maintained as plants or facilities for the production of heat, water, light or power; that in the first instance general purchase agreements were executed whereby the municipalities became obligated to pay plaintiff the purchase price or unpaid portion thereof of the machinery and equipment and subsequently the notes, warrants, bonds, certificates or other instruments were issued by the municipalities pursuant to the terms of the purchase agreement; that with respect to such interest, the obligations are divided into two classes: (1) Instruments which bear interest by the terms thereof; and (2) instruments which do not specifically provide for the payment of interest but in the face amount thereof actually include interest to maturity on the unpaid balance of the purchase price. Plaintiff filed its claim for refund of taxes on the foregoing items and subsequently received from the Commissioner of Internal Revenue notices of disallowance and rejection after which the additional tax was assessed and paid.

In the second count of Case No. 4828 it is alleged that in its income and excess

498

profit tax return for the calendar year 1938 plaintiff reported an income tax liability of $583,539.66 which was duly paid; that in the year 1937, plaintiff sustained a bad debt loss of $478,506 which it failed to deduct in tax return for that year; that the loss was sustained on an open account with its wholly owned subsidiary, Fairbanks, Morse & Company, Ltd., of London, England, which since 1909 had bought and resold plaintiff's products in the United Kingdom. It is also alleged that the plaintiff sustained a further loss of $24,200 which represented the cost to plaintiff of the capital stock of the London Company, and that it likewise failed to deduct this loss in its 1937 tax return, that both losses resulted from the liquidation and dissolution of the subsidiary in January 1937, by reason of the assets remaining after the payment of other debts being insufficient to pay the balance of its open account with plaintiff.

Also in the second count plaintiff seeks recovery of tax on $26,606.02 which it received as interest on municipal obligations similar to those involved in the first count. The total tax sued for in the second count is the sum of $160,116.02 and interest.

Cause No. 4829.

On November 6, 1942, plaintiff in this case, Municipal Acceptance Corporation, filed its complaint seeking recovery of the sum of $20,036.63 in income and excess profit taxes for the calendar year 1937. It is alleged that on March 15, 1938, plaintiff filed its income and excess profit tax return for 1937 showing tax liability of $34,255.10 which was paid; that in the return plaintiff failed to exclude from gross income tax exempt interest in the sum of $73,983.27, which it received during 1937 from municipalities of the various states; that the interest was paid on obligations issued by such municipalities for (1) cash advanced by plaintiff to the municipalities which was used to purchase machinery and equipment chiefly from Fairbanks, Morse & Company for the construction, maintenance and operation of municipally owned power and water plants; or (2) on obligations issued by such municipalities to Fairbanks, Morse & Company in payment for such machinery and equipment which obligations were then purchased by plaintiff, Municipal Acceptance Corporation.

Since both of the above causes, insofar as the claims for recovery of taxes paid on interest alleged to be exempt are concerned, involve common questions of law and fact, they were by this court ordered consolidated for trial on March 22, 1943, as consolidated Cause Number 4828. Thereafter, a hearing was had on the issues in the consolidated cause and an agreed stipulation of facts was filed. Subsequently briefs were filed with the court by both parties. The briefs indicated a difference in the opinions of the parties with respect to the effect of the facts set forth in the stipulation and therefore this court ordered a further hearing on the issues to clarify all objections of the parties to the testimony heard or exhibits introduced, as well as to the contents of the stipulation of facts.

Cause No. 44 C 1442.

On November 28, 1944, the Municipal Acceptance Corporation filed its complaint seeking recovery of $11,755.95 in income and excess profit taxes on income which it failed to exclude from gross income in its tax return for the calendar year 1938. The income was in the form of interest received by the plaintiff from municipalities and the issues involve facts similar to those in the preceding Causes Nos. 4828 and 4829.

Cause No. 44 C 1568.

On December 15, 1944, plaintiff Fairbanks, Morse & Company filed its complaint seeking recovery of an overpayment of $4,511.43 in taxes on income received in the calendar year 1938, in the form of interest on obligations issued by municipalities in circumstances, manner and form similar to those set forth in Complaint No. 4828. In this complaint, plaintiff also seeks to recover the tax paid on recoveries in 1938 of bad debts in the sum of $2,143.89 which it failed to deduct in its income tax return for that year. It is alleged that these debts had been deducted in tax returns for 1931, 1932 and 1933, without tax benefit.

On April 3, 1945, the latter Causes Nos. 44 C 1442 and 44 C 1568 were on agreed motion of all parties by order of this court consolidated for trial with Causes Nos. 4828 and 4829, and these four causes are now before the court as Consolidated Cause No. 4828.

After the four causes were consolidated, the plaintiff introduced further testimony

into the record pertaining to the value of the assets received by the plaintiff after the dissolution of the two subsidiary companies and which were applied toward payment of their respective open accounts with plaintiff. With respect to the claims in the latter suits, No. 44 C 1442 and 44 C 1568, for recovery of taxes paid on interest received on municipal obligations, a supplemental stipulation of facts was filed by the parties. The supplemental stipulation also contains certain statements which relate to the character of the entries made by the plaintiff Fairbanks, Morse & Company on its books with respect to the recoveries of bad debts claimed as deductions in the first count of Cause No. 4828.

While it is claimed that the liquidation of the two subsidiaries, Fairbanks, Morse Home Appliances, Inc., and Fairbanks, Morse & Company, Ltd., resulted in losses to plaintiff Fairbanks, Morse & Company from similar circumstances, there is a difference in the proof with respect to the two losses and these claims will be discussed separately in this opinion. The claims for recovery on bad debt exclusions in Causes No. 4828 for the year 1936 and No. 44 C 1568 for the year 1938 will be discussed as a single item. The claims for recovery of taxes paid on interest received on obligations of municipalities will also be discussed here as a single item.

To the complaints described above the defendant has filed answers which, in substance, admit allegations of fact where the facts appear of record, assert lack of knowledge of factual allegations which do not appear of record and deny all liability.

Fairbanks, Morse Home Appliances, Inc.

This item is claimed as a deduction for the year 1936, by the plaintiff, Fairbanks, Morse & Company. The facts relied on to establish the right to this deduction are found in the written stipulation or in the exhibits attached thereto.

The plaintiff, Fairbanks, Morse & Company, has for a long time been a manufacturer of scales and similar articles. In April of 1934 the plaintiff purchased all of the capital stock of Audiola Radio Company for the sum of $7,110. A purchase agreement was executed. This agreement is of significance only because it contains a provision that the plaintiff should provide the Audiola Radio Company with necessary working capital not to exceed the sum of $75,000 by way of inter-company loans or advances on open account from the purchaser to or for the Audiola Radio Company; or at the option of the purchaser by purchasing additional capital stock of Audiola Radio Company. This provision is the basis for one of the contentions advanced by the defendant that the plaintiff could not have suffered a bad debt loss as the result of advances to the subsidiaries because such advances constituted investments rather than debts.

After the acquisition by plaintiff of Audiola, the company immediately commenced to manufacture radios, refrigerators and washing and ironing machines. Two months later the name of this subsidiary was changed to Fairbanks, Morse Home Appliances, Inc. It appears from the stipulation of facts that from the time of the acquisition of the subsidiary, the plaintiff paid from its own bank account the cost of most of the materials and merchandise purchased by Home Appliances, Inc. To evidence these transactions such expenditures were entered on plaintiff's books as debits in an account with Home Appliances, Inc. From time to time as finished goods were sold by Home Appliances, Inc., the proceeds of the sales were deposited by the subsidiary in its own bank account and at intervals remittances were made to the plaintiff in reimbursement. The plaintiff credited such remittances to its account with Home Appliances, Inc. The stipulation specifically states that these debits and credits were entered in the running account with Home Appliances, Inc.

On April 16, 1935, pursuant to a resolution of its Board of Directors, Home Appliances, Inc., ceased depositing in its own bank account the proceeds received from the sale of its products and instead forwarded such remittances for deposit in plaintiff's bank account. The reason for this action does not appear in the stipulation or in the evidence introduced in the case. Thereafter plaintiff forwarded to Home Appliances, Inc., funds necessary for the payment of expenses and these were the only funds then deposited in the bank account of the subsidiary.

From the minutes of the meetings of Directors and Stockholders of Home Appliances, Inc., it appears that on January 2, 1936, it was decided to liquidate the Company by selling its assets to the plaintiff in consideration of the plaintiff assuming all of the debts of the subsidiary. On January 3, 1936, a bill of sale was executed embodying such provisions.

The sale of the assets of Home Appliances, Inc., to the plaintiff was carried out by the transfer to the plaintiff of all assets of the subsidiary. These assets were credited on plaintiff's books to the account of Home Appliances, Inc. The gross amount credited was the sum of $681,302. The amount of the credit was determined by an appraisal by one of the officers of both the plaintiff and the subsidiary who appears to have been well qualified in that field. The values given to the merchandise, machinery, etc., were cost, or market, as of January 3, 1936, which ever was lower.

At the time of the dissolution of the subsidiary, its account with the plaintiff showed that it owed plaintiff the sum of $796,056.17. After the credit of assets remaining after the payment of other debts, plaintiff's books showed a balance still due from the subsidiary on open account of $188,722.22. After credits for certain reserves, this balance was reduced to the sum of $128,466.63.

In its tax return for the year 1936, the plaintiff claimed the latter amount as a deduction from its income for that year. It also claimed as a deduction from income, the sum of $7,110 as an investment loss resulting from the liquidation of the subsidiary. This amount represented the cost to plaintiff of the original stock of the Audiola Radio Company. In due course, after investigation and reports thereon were made by agents of the Bureau of Internal Revenue, these deductions were disallowed by the Commissioner of Internal Revenue.

The defendant contends that plaintiff is not entitled to this deduction because:

1. Plaintiff actually purchased the assets of the subsidiary and thereby extinguished the debt.

2. The payments made by the plaintiff for merchandise purchased by the subsidiary actually were investments and did not create debts.

3. Or, assuming that these payments did create debts owing to the plaintiff, the plaintiff did not ascertain the debts to be worthless and charge them off in the year 1936.

■ As to defendant's contention that the payments advanced by the plaintiff did not create debts no applicable authorities are cited. Whether the funds advanced by the plaintiff as the sole owner of the stock of Home Appliances, Inc., were loans or contributions to capital depends entirely upon the circumstances under which they were made. Such advances would be additional contributions to capital only if they had been intended to enlarge the stock investment and had not been intended as loans. Edward Katzinger Company v. Commissioner, 44 B. T. A. 533. Here the parties intended these advances as loans. This is shown by the character of the transactions. The plaintiff carried on its books an open account with Home Appliances, Inc. In this account the payments and advances were charged to the subsidiary and remittances were credited to the account. The plaintiff did not purchase any additional capital stock of the subsidiary. The contract whereby plaintiff acquired the stock of the subsidiary provided that advances made by the plaintiff should be in the form of inter-company loans or advances on open account unless plaintiff purchased additional capital stock of the subsidiary. Therefore, this portion of plaintiff's claim falls within the well established rule that when the wholly owned subsidiary is liquidated by the transfer of its assets to the parent company, the latter can deduct whatever loss results in the form of an unpaid balance due from the subsidiary on open account. Edward Katzinger Company v. Commissioner, 44 B.T. A. 533; H. G. Hill Stores, Inc., v. Commissioner, 44 B. T. A. 1182. This rule must govern the foregoing facts in this case unless the defendant can show that for some other reason plaintiff is not entitled to this deduction as a bad debt loss.

Defendant also contends that in the liquidation and dissolution of the subsidiary, Home Appliances, Inc., plaintiff purchased the assets of the subsidiary and in consideration therefor agreed to assume and discharge all of its liabilities. By this method, it is asserted plaintiff cancelled the indebtedness due from the subsidiary.

■ A bill of sale was executed by Home Appliances, Inc. It recites the consideration to be the assumption and discharge by the plaintiff of all accrued liabilities of the subsidiary. The minutes of a directors' meeting of Home Appliances, Inc., held on January 2, 1936, indicate that it was the intention of the directors to effect a dissolution of the company by a sale of the assets to plaintiff Fairbanks, Morse & Company in consideration of the plaintiff assuming and discharging all of the accrued liabilities of the subsidiary. How-

ever, this is not a novel method of liquidating a subsidiary without impairing, for income tax purposes, an unpaid debt due the parent company. This was the exact situation in the case of H. G. Hill Stores, Inc., v. Commissioner, 44 B.T.A. 1182, where the right to deduct from gross income the balance of indebtedness for advances made by the parent corporation to the subsidiary after the application to the account of all of the assets of the subsidiary was upheld. The defendant does not cite any cases in support of a different rule. The case of Dreyfuss v. Commissioner, 5 Cir., 140 F.2d 922, cited by plaintiff, does not involve similar facts.

■ Next, defendant argues that assuming there was an indebtedness, plaintiff did not both ascertain the debts to be worthless and charge them off in 1936. It is further argued that in order to show that the debt was ascertained to be worthless, the proof must show that the debt was collectible in the preceding year. I do not understand this to be the law and the defendant does not cite cases to support such an argument.

■ To entitle the taxpayer to deduct a bad debt he must show: First, that the debt actually was uncollectible during the year in which he claims the deduction; and second, that he actually ascertained the worthlessness for the first time and charged off the debt in the tax year in question. San Joaquin Co. v. Commissioner of Internal Revenue, 9 Cir., 130 F.2d 220. This involves a subjective test; that is, the proper year to claim the deduction is the one in which the taxpayer ascertained the debt to be worthless and charged it off. The stipulation of facts shows that on January 2, 1936, Home Appliances, Inc., owed plaintiff, Fairbanks, Morse & Company, the sum of $796,056.17; that the plaintiff received from the subsidiary, after deducting all liabilities except its own debt, assets of the value of $607,333.95, which left an unpaid balance on the open account between the plaintiff and the subsidiary of $188,722.22. After deduction of $60,255.59 representing certain allowances and reserves, there was a net balance still due the plaintiff in the sum of $128,466.63. By the terms of the stipulation, the entries reflecting this indebtedness, the application of the assets of the subsidiary to the indebtedness, and the net balance due plaintiff, appear in the form of regular entries on plaintiff's books. Certainly when such a substantial amount

of assets was received from the subsidiary and was applied to the indebtedness due from it to the plaintiff and credits reflecting this transaction were entered in plaintiff's books, the entire debt due the plaintiff in any prior year from Home Appliances, Inc., could not have been worthless. For the same reason the plaintiff must have first ascertained in 1936, the portion of the debt that was worthless. The rule is well settled that the taxpayer need not claim a deduction for partial worthlessness of a bad debt. He may do so at his option. But, if he fails to do so in any year, this fact does not foreclose a taxpayer from claiming in a later year a deduction for partial or complete worthlessness of the debt. Reed v. Commissioner, 4 Cir., 129 F.2d 908; Blair v. Commissioner, 2 Cir., 91 F.2d 992; Moock Electric Supply Company v. Commissioner, 41 B.T.A. 1209. Therefore, when Home Appliances, Inc., was liquidated in 1936, plaintiff was entitled to deduct from gross income the unpaid balance due on its account with the subsidiary.

■ Defendant next argues that even if the plaintiff's advances to the subsidiary constitute debts and were ascertained to be worthless and charged off in 1936, the plaintiff has not established the correct amount of such worthless indebtedness. The only argument made in support of this contention is that the correct value of the assets of Home Appliances, Inc., was not ascertained when they were transferred to the plaintiff in 1936. A true and correct balance sheet of Home Appliances, Inc., as of December 31, 1935, is attached to the stipulation of facts. The balance sheet shows an account due and payable to the plaintiff in the sum of $796,056.17. The balance sheet is stipulated to be true and correct. Therefore, the amount of the entire indebtedness is not in controversy. At the second hearing before this court on June 15, 1945, plaintiff introduced in evidence the testimony of S. T. Kiddoo, the Vice President and Treasurer of plaintiff, Fairbanks, Morse & Company, on the value of the assets of the subsidiary when they were transferred to the plaintiff. This testimony showed the witness to be well qualified in the valuation of the assets involved and also showed the value of such assets to be the same as that set forth in the stipulation, namely, $681,302.00. After deducting liabilities due to others than the plaintiff in the sum of $73,968.05, the value of the assets remaining was $607,333.95 as

shown on the plaintiff's books. Therefore, the bad debt deduction claimed by plaintiff in the sum of $128,466.61 is sustained.

Capital Stock of Home Appliances Inc.

The plaintiff's claim of an investment loss on account of the capital stock of Home Appliances, Inc., becoming worthless involves a different rule of law. The year in which the stock became worthless is purely a question of fact. To be entitled to a deduction on account of stock becoming worthless, the taxpayer must submit evidence to show that the stock actually became worthless in the year for which the deduction is claimed. Bartlett v. Commissioner, 4 Cir., 114 F.2d 634, and cases there cited, San Joaquin Co. v. Commissioner of Internal Revenue, 9 Cir., 130 F.2d 220. To discharge this burden of proof it is imperative that the evidence show that the stock had some value, potential or intrinsic, in the preceding year. In the instant case, the stipulation of facts does not contain any statements relative to the value of this stock. The stipulation does recite that the plaintiff purchased the stock of Audiola Radio Company (name later changed to Fairbanks, Morse Home Appliances, Inc.) on April 18, 1934, for, the sum of $7,110; that on December 31, 1935, plaintiff charged its earned surplus with the book deficit of Home Appliances, Inc., as of December 31, 1934, in the amount of $103,177.81. Also on December 31, 1935, plaintiff charged its general profit and loss account with the sum of $99,748.-71, which represented the net loss of Home Appliances, Inc., for the year 1935. In its tax return for the year 1935, plaintiff increased its book income for that year by $99,748.71, thereby including this amount as taxable income for that year. However, this would not alter the fact that Home Appliances, Inc., did sustain a net loss of that amount at the close of the year 1935. The balance sheet of Home Appliances, Inc., attached to the stipulation dated as of December 31, 1935, shows that the liabilities of the subsidiary far exceeded its assets at that time. If measured by the ratio of assets to liabilities, the proof would not show that the capital stock of Home Appliances, Inc., ever had any value or that it actually became worthless in the year 1936.

However, Home Appliances, Inc., continued in operation only from April 18, 1934, until January of 1936. Defendant concedes that this company was a new business venture by the plaintiff. After it acquired the stock, plaintiff advanced to the subsidiary over a million dollars by way of advances and loans for the payment of merchandise. The subsidiary continued in active operation until in January 1936. The value of the stock during the life of the subsidiary always depended upon future possibilities. This is often true when new firms risk their capital in new ventures. Therefore, the stock of the subsidiary must have had a potential value so long as it was backed by the assets of the plaintiff.

It is a well established rule that when a subsidiary corporation that is wholly owned by a taxpayer ceases doing business the parent corporation can take its loss on the capital stock of the subsidiary in the year of its cessation. In the case of American Utilization Company v. Commissioner, 38 B.T.A. 322, it was held that mere depreciation in the value of stock, even to almost the vanishing point, does not entitle a taxpayer to take a deduction of his investment therein. A deduction is permissible only when the stock has become entirely worthless and usually some identifiable event should occur in the taxable year to determine such worthlessness. On the well established rules of law governing loss deductions on account of worthless stock and bad debts of a subsidiary, the facts in the instant case entitle the plaintiff to a deduction in the year 1936 of its investment in the capital stock of Home Appliances, Inc. Houghton & Dutton Co. v. Commissioner, 26 B.T.A. 52; Prosperity Company v. Commissioner, 27 B.T.A. 28.

However, defendant contends that the stock of Home Appliances, Inc., actually became worthless in some year prior to 1936. As stated by the Circuit Court of Appeals of the Seventh Circuit in the case of Morton v. Commissioner of Internal Revenue, 112 F.2d 320, the worthlessness of a stock as of a particular year is a question of fact requiring practical consideration of all the facts and circumstances and each case must stand on its own facts. St. Louis Union Trust Co. v. United States, 8 Cir., 82 F.2d 61, 66; Forbes v. Commissioner, 4 Cir., 62 F.2d 571; and Industrial Rayon Corporation v. Commissioner, 6 Cir., 94 F.2d 383. In the instant case, plaintiff purchased the stock of Audiola Radio Company on April 18, 1934, for the sum of $7,110. From all the facts in evidence it appears that this was a bona fide business transaction and that the stock

of Home Appliances, Inc., had a value of that amount on that date. Subsequently, Home Appliances, Inc., commenced the manufacture and sale of radios, refrigerators, and washing and ironing machines. In this business it had the plaintiff's financial backing. This financial backing from the date the stock was purchased until the dissolution of the company amounted to more than a million dollars as shown by the account of Home Appliances, Inc., on plaintiff's books. The financial backing continued until the subsidiary ceased operations and dissolved in 1936. Whether the assets exceeded the liabilities in the years prior to 1936 cannot alone determine the value of the stock of a company engaged in the business of manufacturing and selling merchandise. Dunbar v. Commissioner of Internal Revenue, 7 Cir., 119 F.2d 367, 369, 135 A.L.R. 1424. Plaintiff's business venture in acquiring and operating Home Appliances, Inc., consisted of a cash investment and an idea. This idea was backed by the plaintiff's financial resources from April 18, 1934, until January 2, 1936. It was a going business during the entire period. As the Court said in the Dunbar case "the statute contemplates the deduction from gross income of losses which are fixed by identifiable events, such as the sale of property, etc. United States v. White Dental Co., 274 U.S. 398, 47 S.Ct. 598, 71 L.Ed. 1120; Rosing v. Corwin, 2 Cir., 88 F.2d 415; Dresser v. United States, 55 F.2d 499 [74 Ct.Cl. 55]; Lewellyn v. Electric Reduction Co., 275 U.S. 243, 48 S. Ct. 63, 72 L.Ed. 262." In the instant case the decision of the stockholders and directors of Home Appliances, Inc., to liquidate the company and the subsequent dissolution furnishes the necessary identifiable event.

To hold that the stock of the subsidiary did not have any value at the time it was purchased by plaintiff would be to substitute the opinion of the Commissioner of Internal Revenue for that of a taxpayer ready and willing to risk its capital in a commercial enterprise. To hold that subsequent to this purchase by plaintiff the stock became worthless in the years 1934 or 1935 would mean that Home Appliances, Inc., in order to receive the benefit of a deduction allowed by law, would have had to quit business in either one of those years, depending on the Commissioner's opinion, rather than in 1936. If this were the law, then in order to deduct a loss of a capital investment in a corporation whose

business was not yet well established, a taxpayer would need the Commissioner's determination of whether the business should be discontinued or be at liberty to continue with the expectation of achieving ultimate commercial success. It is normal practice for taxpayers to purchase the stock of financially weak corporations which later, as the result of good business judgment, achieve success. If, in such a case, the business never achieved success so far as the ratio of assets to liabilities is concerned, and upon dissolution of the business a loss on capital investment was denied, the effect would be to require prior approval by the government of every new business venture.

At the time when Home Appliances, Inc., ceased operations in 1936, it had assets with an aggregate value of more than $600,000. The plaintiff had purchased the business in good faith and the subsidiary continued full business operations until it assigned or sold its assets to the plaintiff. In these circumstances it could not have been determined prior to 1936 that the stock of the subsidiary was worthless. Again quoting from the Dunbar case "who is there to define as unreasonable that man who under such circumstances concludes that something of value still remains in his capital stock?" Therefore, the plaintiff's claim for recovery of taxes on its investment loss of Home Appliances, Inc., in the year 1936 will be sustained.

### Fairbanks, Morse & Company, Limited.

This company is referred to in the stipulation of facts as the London Company. The plaintiff contends that the facts on which recovery is claimed for the bad debt and investment losses which resulted to plaintiff through the dissolution of this company are similar to the facts in the case of Home Appliances, Inc., and that the legal principles governing both claims are the same. The complaint alleges and the facts show that there was a company organized under the laws of Great Britain with the name of Fairbanks, Morse & Company, Limited, whose registered office was at Birmingham, England. The facts also show that plaintiff, Fairbanks, Morse & Company sold merchandise to the English Company and that such sales were recorded in plaintiff's books in an open current account with the English Company and that receipts from such sales were credited to the same account. Attached

504

to the stipulation of facts is an exhibit of fifty pages. By the terms of the stipulation the exhibit is a transcript of the open account as recorded in plaintiff's ledger from July 1909 to February 1937, except for the years 1919 and 1922 to 1925, both years inclusive, and also the months of January, February and March of 1927. The stipulation recites that plaintiff's ledgers are not available in the periods included in the exception.

The defendant urges strongly that because plaintiff's ledgers are not available for all periods, proper proof of the correct amount due plaintiff from the English Company has not been made. However, an examination of the entire open account shows that the beginning entry in plaintiff's ledger for 1920 is a debit balance of $307,039.67; the beginning entry for 1926 is a debit balance of $433,821.37; the debit balance for January 1, 1927 is entered as zero; but an entry dated March 31, 1927, records total debits from the branch house journal in the sum of $465,-188.49. Thereafter, the entries in the open account in plaintiff's ledgers are continuous and show a debit balance on December 31, 1936, after credits of all receipts from the English Company of $579,-887.61. The beginning entry for January 1, 1937, reflects the debit balance of $579,-887.61 as of December 31, 1936. A credit entry dated January 31, 1937, shows cash receipts of $3,810.13, which would reduce the debit balance to $576,077.48 as of January 31, 1937.

The stipulation of facts recites that no books and records of the London Company are available. However the stipulation also recites as follows:

"From the date of its organization until its final winding up in January 1, 1937, substantial quantities of articles manufactured by the plaintiff were shipped to the London Company and charged on an open account on the plaintiff's books. During the same period the London Company from time to time made cash payments to the plaintiff, which were credited on the open account on the books of the plaintiff."

Thus the authenticity of the entries in plaintiff's ledgers in its account with the London Company is supported, at least in a general way, by the terms of the stipulation. Further support is found in a later paragraph of the stipulation which reads as follows:

"The books, accounts and records of the plaintiffs and of the other corporations mentioned in the complaints herein at all times were so kept and the entries therein so made that the general ledgers of Fairbanks, Morse & Company and said other corporations, where said general ledgers are available, show the same and identical charges, credits and state of account as between Fairbanks, Morse & Company and said other corporations as would be shown by the original tickets, invoices and other contemporaneous memoranda of transactions reflected in the books and by journals, day books, cash books and other books of original entry containing the original entries relating to transactions between Fairbanks, Morse & Company, on the one hand, and said other corporations, respectively, on the other (including the transactions mentioned in the complaints herein)."

Further evidence of a bona fide debt due plaintiff from the London Company in January 1937, in the sum of $576,077.48 is found in plaintiff's exhibits 97(a) to (u) which consists of balance sheets, trial balances and profit and loss statements of the London Company as of December 31st of each year from 1930 to 1936 inclusive and as of January 15, 1937. These balance sheets show the following amounts owing from the London Company to plaintiff in terms of English pounds, shillings and pence: 1930—158,890/16/9; 1931—185,-914/1/11; 1932—184,429/10/11; 1933—128,436/7/9; 1934—128,334/3/9; 1935—131,052/18/6; 1936—131,282/8/11; and January 15, 1937—130,579/10/0. Each of these balance sheets bears the following certificate:

"I have audited the Balance Sheet of Messrs. Fairbanks, Morse & Company, Limited, dated 31st December (respective years) as above set forth with the books and accounts relating thereto. I have obtained all the information and explanations I have required. In my opinion such Balance Sheet is properly drawn up so as to exhibit a true and correct view of the state of the Company's affairs according to the best of my information and the explanations given to me and as shown by the books of the Company.

"(Signed)   Herbert J. Poye
"Chartered Accountant
"Auditor"

Without ascertaining the true rate of exchange prevailing on the dates of the respective balance sheets, the amounts of indebtedness shown there to be due plaintiff correspond substantially with the opening entries of the debit balances for the same years in the open account in plaintiff's books.

At the beginning of the stipulation of facts the parties reserved the right to object to the consideration of such facts on the grounds of immateriality and irrelevancy. At the time the stipulation was filed with the Court, the defendant made a further oral reservation of the right to make the same objection at the end of the hearing. At the same hearing, plaintiff filed its exhibit 97(a) to (u) (the collective balance sheets above referred to of the London Company) without any objection being made to this exhibit by the government. When briefs were filed it was observed that the government contended that plaintiff's records which were attached to the stipulation or had been introduced in evidence were incomplete and inadequate to prove the amount of the debt due plaintiff from the London Company. Considering the state of defendant's objections as unsatisfactory, on April 30, 1945, this court ordered the defendant to clarify this situation by filing a formal written statement of all objections which he desired to make to the evidence. On June 20, 1945, the defendant filed his written objections. These objections, so far as they concern the London Company, may be summarized as follows:

1. The admissibility of the ledger sheets (Exhibit 9) reflecting the running open account of plaintiff with the London Company is not objected to, thus conceding the competency of this exhibit. The exhibit is objected to as being immaterial and irrelevant as proof of the amount of the debt due plaintiff from the London Company, because ledger sheets which would reflect entries of individual transactions for 1919 and 1922 to 1925, inclusive, are not available.

2. Exhibit 9a, which is a transcript of plaintiff's account headed "London Contingency Account," reflects entries to show the status of the open account with the London Company at the end of each year from 1919 to February 28, 1937. Beginning with 1933 this account was headed "Reserve for Deficit of Fairbanks, Morse & Company, Limited, England." Objec-

tion is not made to the competency or admissibility of this exhibit, but objection is made to its relevancy and materiality for the purpose of showing the true state of the account because it is said to contain unexplained entries.

3. Exhibit 9b, which shows the value given to the assets of the London Company after they were turned over to plaintiff and which also shows the application of the assets to the debt due plaintiff, is not objected to as being inadmissible and incompetent, but objection is made to its materiality and relevancy to the true value of the assets and liabilities of the London Company.

4. The same objection is made to paragraph 12 of the stipulation of facts which recites that after the assets of the London Company were assigned to plaintiff, plaintiff credited itself with such assets in the sum of $101,064.33; charged itself with liabilities of the London Company in the sum of $27,284.85 and credited the difference in the sum of $73,779.48, to plaintiff's running open account with the London Company.

5. The same objection is made to plaintiff's exhibit 97(a) to (u), which consists of the balance sheets, trial balances and profit and loss statements of the London Company hereinbefore referred to.

Considering first the defendants' written objections to the exhibits reflecting the accounts between plaintiff and the London Company and the amount of indebtedness shown thereon, clearly, if such exhibits are competent they are also relevant as proof of the indebtedness. If the accounts contained unexplained entries or items which were not proper components of a bad debt, such frailties should have been advanced in an objection to the competency of the exhibits. Accounts showing indebtedness due plaintiff from the London Company could be competent and admissible in evidence only if they were material and relevant. If they had not reflected the correct amounts of this indebtedness, they would not have been competent or admissible as proof to that end. Now to contend that such documents having to do solely with the indebtedness are immaterial and irrelevant on that question is to deny their competency although the defendant permitted them to be introduced in evidence without making any objection to their competency or admissibility. This applies as well to plaintiff's ledger sheets which in the opening

entries reflect the balance of the indebtedness on the dates shown, even although the ledger sheets showing the account for certain preceding years were not available. Otherwise the court would have to re-examine the competency and admissibility of such documents although objections on that ground have been waived. Therefore the full contents of these exhibits must be considered in the determination of whether any and how much indebtedness was due plaintiff from the London Company at any pertinent time including January 15, 1937.

For the same reasons full consideration must also be given to plaintiff's exhibit 97(a) to (u). These balance sheets of the London Company show the indebtedness due plaintiff on December 31st of each year from 1930 to 1936 and also to January 15, 1937. Because of the certificate attached to each of these balance sheets, the court had this particular exhibit in mind when it ordered defendant to clarify his objections to the stipulation and exhibits. However, no objection to the competency and admissibility of this exhibit was made when it was introduced in evidence and none has been made since. If the exhibit is competent while bearing the amounts of the indebtedness due plaintiff, certainly it is also relevant.

The foregoing exhibits show that on January 15, 1937, when the London Company commenced dissolution by conveying all of its assets to plaintiff in consideration of plaintiff assuming and discharging all of its debts, the London Company owed plaintiff the sum of $579,887.61. Another cash payment of $3,810.13 was received on January 31, 1937, which reduced the indebtedness to $576,077.48.

With respect to the amount of bad debt loss after application of the London Company's assets to plaintiff's open account, the record is somewhat in conflict. The stipulation of facts recites that plaintiff credited itself on its books with assets of value of $101,064.33 and charged itself with liabilities of the London Company in the sum of $27,284.85 which left a balance in the sum of $73,779.48 to be credited to the open account. It further recites that after the credit of $73,779.48 the open account was then credited with the sum of $502,-706.00 leaving the inference that this latter amount represents plaintiff's bad debt loss. Exhibit 9(b) attached to the stipulation of facts, to the competency and admissibility of which no objection has been made, is an inventory showing the items and value of the assets which were assigned to plaintiff. Defendant's objection is only to the relevancy of this document. The value there shown is the sum of $101,064.33.

F. C. Dierks, Secretary and Director of the plaintiff company, testified at the hearing on June 15, 1945, that he was familiar with the value of the assets turned over to plaintiff; was thoroughly experienced in such matters; had inspected the English plant and its assets in January 1937; and that such assets then had a value of $80,000. He also testified that Exhibit 9b correctly described the assets turned over to plaintiff and that the value shown there was $80,000. On this he was palpably in error. None of the exhibits show precisely the London Company's indebtedness other than to plaintiff. The stipulation recites that plaintiff charged the London Company's assets with $27,284.85 as representing such debts. However, this is not proof of such indebtedness and the witness Dierks did not testify that there was any. Therefore I find that the plaintiff received the full value of the assets shown on Exhibit 9b attached to the stipulation in the sum of $101,064.33 and that this amount must be credited to the indebtedness of $576,077.48 as shown on Exhibit 9. The difference of $475,013.15 was ascertained by plaintiff to be worthless and charged off in 1937. The ascertainment of worthlessness was marked by the dissolution of the London Company as the identifiable event and therefore plaintiff is entitled to recover taxes and interest on its bad debt loss in 1937 of $475,013.15, under the authorities hereinabove cited in connection with the item of Fairbanks, Morse Home Appliances, Inc. This ruling is consistent with the rulings of the Commissioner of Internal Revenue which denied to plaintiff the right to deduct from income the annual losses it had sustained in its dealings with the London Company from 1921 to 1928 inclusive.

### Investment Loss in London Company.

Complaint No. 4828 alleges that plaintiff subscribed to all of the capital stock of the London Company at a cost of $24,200 and that on the dissolution of the London Company in 1937, plaintiff became entitled to deduct that amount from income as an investment loss. However the stipulation of facts is without a word, phrase or sentence that would indicate the plaintiff ever owned all or any part of the stock of

the London Company or ever invested any money in the ownership of that company. None of plaintiff's exhibits in evidence reflects a capital account with the London Company. The stipulation recites that Exhibit 9c attached thereto contains excerpts from copies of "purported minutes" of the London Company during the year 1909. These purported minutes recite that the stock of the company was allotted to individuals named therein. Plaintiff is not named as a holder of such stock. Plaintiff's witness, F. C. Dierks, did not testify about the ownership of such stock. Consequently the record is without proof of any investment loss in the London Company and therefore plaintiff's claim for recovery of taxes on an investment loss in the London Company is denied.

### Recovery of Bad Debts Charged Off in Previous Years.

In the first count of Cause No. 4828 and in Cause No. 44 C 1568 plaintiff, Fairbanks, Morse & Company, seeks to recover income taxes paid on the recovery in 1936 and 1938 of bad debts which it had previously ascertained to be worthless, charged off and deducted from gross income in the years 1931, 1932 and 1933. It is undisputed that these deductions from gross income did not result in a reduction of plaintiff's taxes because of the large net losses which it had sustained and reported in its tax return for each of those years. Plaintiff failed to deduct the recoveries in its tax returns for 1936 and 1938. The amount of bad debt recoveries alleged in Cause No. 4828 is the sum of $12,101.54. This amount has been reduced by the original stipulation of facts to $9,489.75. Cause No. 44 C 1568 alleges bad debt recoveries of $2,143.89, and the amount has been reduced by the supplemental stipulation to $1,601.20.

The Revenue Acts in force during all years involved in this item contained sections allowing deductions from gross income, identical to section 23(k) of the Revenue Act of 1936, 26 U.S.C.A., Int.Rev. Acts, page 828:

"Debts ascertained to be worthless and charged off within the taxable year (or, in the discretion of the Commissioner, a reasonable addition to a reserve for bad debts); and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction."

By Section 116 of the Revenue Act of 1942, Congress amended Section 22 of the Internal Revenue Code to read:

"(b) Exclusions from gross income.— The following items shall not be included in gross income and shall be exempt from taxation under this chapter:

(12) Recovery of bad debts, prior taxes, and delinquency amounts.—Income attributable to the recovery during the taxable year of a bad debt, prior tax, or delinquency amount, to the extent of the amount of the recovery exclusion with respect to such debt, tax, or amount.

"For the purposes of this paragraph:

"(A) The term 'bad debt' means a debt on account of worthlessness or partial worthlessness of which a deduction was allowed for a prior taxable year. * * *

"(D) The term 'recovery exclusion' with respect to a bad debt * * * means the amount * * * of the deductions * * * which did not result in a reduction of the taxpayer's tax under * * * prior revenue laws."

Plaintiff's bookkeeping with respect to accounts which it considered to be uncollectible and with respect to subsequent recoveries on such accounts was as follows:

When an account was considered altogether uncollectible a charge of the full amount was made to profit and loss and an equal credit was made to an account called suspended accounts reserve. At the same time an account called suspended accounts receivable was charged with the same amount and accounts receivable was credited. If at some later time it was believed that all possibility of recovery had vanished, the suspended accounts reserve was charged and suspended accounts receivable was credited, thereby removing the account from the books entirely.

When an account was considered only partly worthless, a charge was made to profit and loss of the portion considered uncollectible and a credit was made to suspended accounts reserve. If additional portions of the account were later determined to be worthless the procedure was repeated for such portions until such charges and credits equaled such portions. When the charges and credits equaled the full account, it was transferred to suspended accounts receivable and when plaintiff believed that all possibility of collection had vanished, suspended accounts receivable was credited and suspended ac-

counts reserve was charged, thereby eliminating the account from plaintiff's books.

Plaintiff contends it is entitled to the deductions from gross income for the years 1936 and 1938, of the recoveries made in each of these years on debts which had previously been deducted in 1931, 1932 and 1933, without any tax benefit, on a legal principle that was well established prior to the amendment in the 1942 Revenue Act; i. e. recoveries in any taxable year on debts previously charged off and deducted from gross income are not taxable except to the extent that such recovery exceeded the tax benefit to plaintiff when the account was charged off. Numerous authorities are cited in support of this proposition. Plaintiff also contends that irrespective of the state of the law prior to the 1942 Revenue Act, the amendment in that Act resolved all dispute, citing the recent decisions of Bank of Newberry v. Commissioner, 1 T.C. 374, and First National Bank of Fort Worth v. Commissioner, 1 T.C. 1214.

Defendant admits the legal propositions advanced by plaintiff to support its claim for recovery on these items but contends that plaintiff's method of treating the accounts on its books constituted the reserve method rather than the charge off method. If plaintiff used the reserve method of handling bad accounts it would .not be entitled to the recovery exclusions because the bad debt would not have been deducted and therefore Section 22(b) (12) would not apply. In contending that the entries on plaintiff's books constituted the reserve method rather than the charge off method, defendant insists that these accounts were not eliminated from assets or from income until the plaintiff had determined that all possibility of recovery had ceased and the charge had been made to suspended accounts reserve; that is, until the particular account had completely disappeared from the books.

Congress has not prescribed any particular method of charging off worthless accounts. Neither Congress nor the Commissioner of Internal Revenue has attempted to impose upon taxpayers any particular form of bookkeeping. American Cigarette & Cigar Co. v. Bowers, 2 Cir., 92 F.2d 596; Hamlen v. Welch, 1 Cir., 116 F.2d 413; Commissioner v. MacDonald Engineering Co. 7 Cir., 102 F.2d 942; Rubinkam v. Commissioner, 7 Cir., 118 F.2d 148. It is clear in the instant case that a charge off actually occurred when the account in its entirety or in some portion was determined to be uncollectible and a charge was made to profit and loss and a credit was made to suspended accounts reserve. The charge to profit and loss caused a corresponding deduction from income in plaintiff's income tax return and the credit to suspended accounts reserve showed that the item had been removed from assets.

A charge to profit and loss is sufficient to constitute a charge off. Hamlen v. Welch, 1 Cir., 116 F.2d 413. The other entries made by plaintiff certainly were not intended to affect the charge to profit and loss. Unless extraordinary circumstances were present to modify the meaning of this entry, the item necessarily would be deducted from income. If plaintiff desired, by using complex rather than simple methods of bookkeeping, to retain the account on its books for business purposes, such as a reminder to attempt collection at a future date, it could do so without affecting the charge off. As the court said in the case of Hamlen v. Welch, 116 F.2d 413, at page 420:

"Here the taxpayer charged the item to profit and loss on his books, and it does not appear to be the law that any evidentiary preservation of the obligation disproves an earlier ascertainment of worthlessness."

The only grounds advanced by defendant in support of the contention that plaintiff was not treating worthless accounts by the charge off method are (1) that the initial charge to profit and loss was not reflected in income and (2) that the account was not removed from assets until some later time when suspended accounts reserve was charged. The supplemental stipulation of facts which was filed several months after defendant's brief was submitted, seems to have completely removed these grounds. Page 2 of the supplemental stipulation reads:

"With respect to the wholly uncollectible accounts, while they remain on the books as suspended accounts receivable and suspended receivable reserve, * * * they are completely eliminated from the statements and balance sheets of the plaintiff. As to the partially uncollectible accounts, while the portions thereof determined to be uncollectible remain on the books as ac-

counts receivable, and are also reflected in suspended accounts receivable reserve, * * * such portions are eliminated from the statements and balance sheets of the plaintiff. The charges to profit and loss mentioned in paragraph 9 of the original stipulation were reflected in the computation by the plaintiff of its taxable income for the tax years 1931, 1932 and 1933."

The facts as stipulated show that when plaintiff determined accounts to be wholly or partially worthless, they were, in the first instance, charged to profit and loss, deducted from income and removed as assets from the plaintiff's statements and balance sheets. Under the authorities cited above this procedure constituted a charge off of the particular items. These facts would not have been true had the reserve for bad debts method been used. Therefore, plaintiff's claims with respect to bad debt recoveries for 1936 and 1938 are sustained.

### Interest Received from Municipalities.

Prior to the respective years of 1936, 1937 and 1938, plaintiff Fairbanks, Morse & Company, sold machinery and equipment to municipalities for use in the construction, extension or maintenance and in the operation of plants for the production and transmission of heat, water, light or power. It is stipulated that all of the municipalities were political subdivisions of the states where they were located and that they operated the plants for which the machinery and equipment was purchased. Presumably in some instances the municipalities paid the full purchase price at the time the machinery was delivered. In other instances, according to the stipulation of facts, the municipalities agreed to pay the purchase price or the unpaid portion thereof at some future time. Pursuant to the agreements the municipalities subsequently issued and delivered municipal rental certificates, lease warrants, revenue bonds, revenue warrants, revenue certificates or notes in payment of the machinery. The rental certificates, lease warrants and notes were general obligations of the municipalities; i. e. general promises to pay the sums specified therein without designating what municipal fund was to be used for this purpose. Of these, only the notes provided for the payment of interest. The rental certificates, lease warrants and notes, being general obligations, would of necessity be paid out of the general funds of

the municipality. The revenue bonds, revenue warrants and revenue certificates were, by their terms, payable only from the revenues of the plants. The revenue bonds, in addition, were secured by a mortgage on the equipment. In transactions where revenue warrants and revenue certificates were issued by the municipality, title to the machinery and equipment, by the terms of the agreement under which it was delivered, was retained by the plaintiff, Fairbanks, Morse and Company. The terms of the revenue bonds, warrants and certificates expressly state that such obligations are not general obligations or liabilities of the municipalities payable out of any tax fund, but that they are special obligations payable solely from the revenues of the plants and that the taxing powers of the municipalities are not involved. All of these instruments were interest bearing by their terms or were for a face amount which included interest of specified rate and amount.

When any of the foregoing instruments were received by plaintiff, Fairbanks, Morse & Company, accounts with the respective municipalities were set up on plaintiff's books. As payments were received, entries were made in the accounts crediting the municipalities with the proper amount of principal paid and also with the amount of interest that was included in the payment.

The instruments acquired by plaintiff, Municipal Acceptance Corporation, were either purchased directly from the municipalities or, to the extent of the claims involved here, from Fairbanks, Morse & Company. Upon receipt of the instruments, notes receivable accounts were set up on its books and also accrued interest and earned interest accounts. As payments were received, entries were made of proper credits showing the amount of principal and of interest received.

However, by the terms of the stipulation of facts, the interest receipts actually admitted by the defendant are limited to revenue bonds, revenue warrants, revenue certificates and notes of the municipalities. In 1936, plaintiff, Fairbanks, Morse & Company, received a total of $23,044.37 as interest payments on such obligations. Of this amount $20,979.49 was received on revenue bonds, warrants and certificates. $2,065.38 was received on promissory notes which constituted general obligations to pay out of the general funds, whether from revenue or from taxes. In 1937 it received

$19,026.54 from revenue obligations and $2,859.54 from notes or general obligations, for a total of $21,886.08. In 1938 it received total interest of $23,849.91; $22,699.-82 from revenue obligations and $1,150.09 from notes.

In 1937, plaintiff, Municipal Acceptance Corporation, received total interest income on the same kind of obligations of $67,631.-96; of this amount $67,482.94 was on revenue obligations and $149.02 on promissory notes. In 1938, it received $63,999.59 in interest on revenue obligations and $227.80 on notes for a total of $64,227.39.

Section 22(b) of the Revenue Act of 1936, 26 U.S.C.A. Int.Rev.Code, § 22(b) (applicable to the question of exemption for all years involved), reads:

"(b) Exclusions from gross income. The following items shall not be included in gross income and shall be exempt from taxation under this title: * * *

"(4) Tax-free interest. Interest upon (A) the obligations of a State, Territory, or any political subdivision thereof, or the District of Columbia; or (B) obligations of a corporation organized under Act of Congress, if such corporation is an instrumentality of the United States; or (C) the obligations of the United States or its possessions. * * *"

Plaintiffs contend that the interest income set forth above is exempt from taxation under Section 22(b) (4) and not having deducted it from gross income, now seek recovery of taxes paid thereon. Defendant contends that this section does not apply to interest paid on the revenue obligations but concedes that it does apply to interest on the promissory notes. Practically all of the interest income involved here was received on the revenue obligations. The distinction urged by the defendant between the two types of income is that the notes were general obligations based on the credit or borrowing power of the municipalities while in the case of the revenue obligations, payments could only be made from revenues derived from the operation of the plants and were secured by plaintiffs retaining title to the machinery and equipment or in the case of revenue bonds, by the right to proceed against the property under the terms of the mortgage for the payment of which the bonds were issued. It is argued, therefore, that the credit of the municipalities is not involved and that

Section 22(b) (4) does not apply to interest received on such revenue obligations.

Plaintiffs contend, first, that the revenue bonds, warrants, certificates and the promissory notes fall squarely within the plain language of Section 22(b) (4) and, so far as this statute is concerned, cannot be distinguished from other types of municipal obligations which have always received the benefit of the section under the regulations of the Bureau of Internal Revenue as well as by judicial rulings whenever the interpretation of the section was questioned in the courts.

The nature of the liability intended to be created by the issuance of the revenue obligations is stated in the instruments; i. e. the liability or obligation created thereby does not require payment from taxes or general funds but are special obligations payable solely from the revenues of the plants. The written agreements pursuant to which these obligations were issued contain identical language with the added proviso that title to the machinery shall remain in the seller until all payments have been completed. They further provide that the obligations to be issued under the agreements may be negotiated and that title to the machinery shall pass to the subsequent purchasers of the obligations.

The courts thus far have given to the exemption statute, Section 22(b) (4), a construction as broad as the language "the obligations of a State, Territory, or any political subdivision thereof" without holding that the precise character of the obligations would invoke or preclude the benefits of the statute. Norfolk National Bank v. Commissioner, 4 Cir., 66 F.2d 48; Kings County Development Co. v. Commissioner, 9 Cir., 93 F.2d 33; Commissioner v. Meyer, 2 Cir., 104 F.2d 155; Commissioner v. Carey-Reed Co., 6 Cir., 101 F.2d 602, 121 A.L.R. 1272; Bryant v. Commissioner, 9 Cir., 111 F.2d 9; District Bond Co. v. Commissioner, 9 Cir., 113 F.2d 347; Commissioner v. Pontarelli, 7 Cir., 97 F.2d 793, 795.

In the cases cited above the Court considered at length the nature of the transaction leading to the issuance of the obligations as well as the character of the obligation. The transactions with a private aspect are illustrated in the Norfolk National Bank case. There a private corporation made contracts with the state and caused banks to loan money to the state to

enable it to carry out the contract. The private corporation then assigned the contracts to the banks and gave the banks its own interest bearing notes as security for the loan by the banks to the state. It was held that the interest paid to the banks on the notes was exempt under Section 22(b) (4) because it was paid on money borrowed by the state. In the case of Kings County Development Co. v. Commissioner, a private corporation purchased land in a water storage district. In the purchase contract, the corporation agreed to pay the stated purchase price with six percent interest with the proviso that the contract could be assigned to the Water Storage District, a political subdivision of the state, which would perform the terms of the contract. The assignment was made to the Storage District which, in turn, paid to the original sellers of the land the purchase price and interest. The court held that the interest so paid was exempt from taxation, at the same time pointing out the difference between interest paid on such a transaction and interest recovered by a private party on a condemnation award or on a tax refund. The case of Commissioner v. Meyer, involved a similar situation and the interest was held exempt.

The cases of Commissioner v. Pontarelli, Commissioner v. Carey-Reed Co., Bryant v. Commissioner, and District Bond Co. v. Commissioner involved the issuance by municipalities of interest bearing special assessment bonds. The bonds were payable from special funds to be raised by taxes levied only against the property benefited by the improvements for which the bonds were issued. The interest on these bonds was held to be exempt. The opinion in the Pontarelli case decided by the Circuit Court of Appeals of this Circuit contains the following observation:

"Neither the bonds nor the statute under which they were issued give the holder the right to proceed against the property benefited or the owner thereof. It is to the City he must look for the discharge of the obligation. Surely, when the debt was created and the bonds issued as evidence thereof, an obligation was created. Determined by the legal rights of the parties, that could have been the obligation of no one but the City. The City 'promises to pay to bearer' and this undertaking is qualified only as to the funds out of which the payment is to be made. The City is charged by law with the duty of employing 'all reasonable diligence' to cause taxes and assessments to be levied and collected to pay the bonds. By statute (Illinois Revised Statute, 1937, Ch. 24, § 799) the City is subject to an action in mandamus or injunction to enforce its responsibility in connection with the levying and collection of assessments to make such payments. The Revenue Act in question evidences the clear intention of Congress that such income shall be exempt. The language of the regulations promulgated by the Treasury Department from time to time is likewise plain and unambiguous. The fact is, there is little, if any, room for construction of such plain and direct words. It is conceded that the Treasury Department has consistently ruled that interest on such special assessment bonds is exempt from Federal income tax. It is a general rule of statutory construction that where a statute has received executive construction by the officers charged with its execution and such construction has been uniformly applied over a long period of time, and Congress has subsequently re-enacted the provision in the same or substantially the same language, Congress, by such re-enactment adopts the construction placed thereon by the Executive. In Buttolph v. Commissioner of Internal Revenue, 7 Cir., 29 F.2d 695, at page 696, this court said:

" 'Such re-enactment of a statute, after practical construction—not plainly erroneous—and specific operation under it, may presumably be construed to embody such construction as a satisfactory interpretation of the legislative intent. New York, New Haven & Hartford R. Co. v. Interstate Commerce Commission, 200 U.S. 361, 401, 26 S.Ct. 272, 50 L.Ed. 515; Copper Queen Mining Co. v. Territorial Board of Arizona, 206 U.S. 474, 479, 27 S.Ct. 695, 51 L.Ed. 1143.' "

The case of Bryant v. Commissioner, 9 Cir., 111 F.2d 9, involved interest on special assessment bonds issued by the City and County of Los Angeles, California. At page 13 of the opinion in 111 F.2d, the Circuit Court of Appeals for the Ninth Circuit distinguished between governmental and proprietary activities of a municipality:

"Not only are the bonds public in character, they were issued in the performance of an essential governmental function. We are not concerned here with bonds to repay money borrowed to create works of a

proprietary character from whose income for services rendered the bond principal and interest are paid. The borrowing here is on the pledge of governmental taxing power for improvement of streets and roads held, in California, in a governmental and not a proprietary capacity."

It has been stated repeatedly in the decisions dealing with interest on governmental obligations that the purpose of the exemption statute was to aid the borrowing and bargaining power and the credit of state municipalities. Helvering v. Bank, 293 U.S. 84, 55 S.Ct. 50, 79 L.Ed. 211: American Viscose Corporation v. Commissioner, 3 Cir., 56 F.2d 1033.

This leads to an inquiry into the nature of the transactions involved in the instant case as well as to the more important question of what powers or attributes of sovereignty are involved. Here, the municipalities were bargaining for the installation and use of machinery and equipment in the production of light, power, heat or water with the purpose of ultimately acquiring full title to the equipment. This title would become vested upon the full payment of the purchase price specified in the original agreements. They did not desire to incur general obligations which might require payment from tax funds, but preferred to pay for the equipment only from the revenues of the plants themselves. To attain these objectives they agreed to create a special fund from the revenues of the plant which fund would be used to pay the purchase price. In order to use this method of acquiring power plants, title to the equipment had to remain in the seller. Formal obligations embodying provisions consistent with the agreements were issued and exchanged either for the equipment or for money to purchase the equipment. These obligations, although limiting liability for the face amount thereof to the special funds created from the revenues, bore on their face the promise of the municipality to pay the stated amount of principal and interest. With respect to the revenue bonds, in case of default in payments the holders of the bonds were secured only by a mortgage on the equipment. Where revenue warrants or certificates were used, title to the equipment rested in the seller or in the holders of the obligations. Thus to retain this machinery and equipment and ultimately acquire title thereto, the municipalities had to make the specified payments from their revenue funds. These funds were as much the property of the municipalities as their tax funds and therefore their property was used to discharge these obligations. Certainly these transactions involved the borrowing and bargaining powers as well as the credit of municipalities. From these facts it can hardly be denied that the revenue obligations constituted obligations of the municipalities. This fact can also be gathered from the stipulation of facts which divides the interest receipts involved into two categories: "Revenue obligations" and "General obligations."

The method employed by the municipalities in the instant case for the acquisition and use of light and power plants is in common use throughout the country and in every instance when the Commissioner of Internal Revenue has sought to tax interest on municipal revenue obligations, similar if not identical to the instruments involved here, the courts have held such interest exempt under Section 22(b) (4). See Commissioner v. Shamberg's Estate, 2 Cir., 144 F.2d 998; Commissioner v. White's Estate, 2 Cir., 144 F.2d 1019; First National Bank of Birmingham v. United States, D.C., 59 F.Supp. 49.

The plain wording of Section 22(b) (4) does not suggest that a difference in the type or character of an obligation of a state or political subdivision thereof should determine the applicability of the exemption provisions of that statute. The obligations involved here are as contractual in nature as any other type of obligation and if it were necessary to decide the question, they might very well be governed by the principle that the federal government is without power to tax income from securities of a state or its instrumentalities. See Pollock v. Farmers' Loan & Trust Co., 157 U.S. 429, 15 S.Ct. 673, 691, 39 L.Ed. 759, where the court said:

"* * * But we think the same want of power to tax the property or revenues from the states or their instrumentalities exists in relation to a tax on the income from their securities, and for the same reason; and that reason is given by Chief Justice Marshall, in Weston v. Charleston, 2 Pet. 449, 468, 27 U.S. 449, 468 [7 L.Ed. 481, 488] where he said: 'The right to tax the contract to any extent, when made, must operate on the power to borrow before it is exercised, and have a sensible

influence on the contract. The extent of this power depends on the will of a distinct government. To any extent, however inconsiderable, it is a [burden] on the operations of government. It may be carried to an extent which shall arrest them entirely. * * * The tax on government stock is thought by this court to be a tax on the contract, a tax on the power to borrow money on the credit of the United States, and consequently to be repugnant to the constitution.' Applying this language to these municipal securities, it is obvious that taxation on the interest therefrom would operate on the power to borrow before it is exercised, and would have a sensible influence on the contract, and that the tax in question is a tax on the power of the states and their instrumentalities to borrow money, and consequently repugnant to the constitution."

The defendant relies on the portion of the opinion hereinbefore quoted in the case of Commissioner of Internal Revenue v. Pontarelli, 7 Cir., 97 F.2d 793, as holding that instruments which specify that title or the right to repossess the property is retained by the seller, are not covered by the exemption statute. However, there the court was clearly referring to the right to proceed against a private citizen as distinguished from a municipality. The court's comments contemplate an entirely different situation as do also the decisions holding that profits or income of a citizen dealing with or employed by a state are taxable by the federal government. See Helvering v. Gerhardt, 304 U.S. 405, 58 S.Ct. 969, 82 L.Ed. 1427; Graves v. New York ex rel. O'Keefe, 306 U.S. 466, 59 S.Ct. 595, 83 L.Ed. 927, 120 A.L.R. 1466. Such cases do not involve the bargaining or borrowing power or interest on the obligations of a political subdivision of a state.

I believe that the obligations involved here automatically fall within the provisions of Section 22(b) (4) and that interest received on such obligations is exempt from federal taxation. The plaintiffs' claims with respect to these items will be sustained.

As provided in the original stipulation of facts, the parties in the above actions will prepare and present to the court a computation of the taxes due plaintiffs in accordance with terms of this memorandum whereupon an order of judgment will be entered.