No. 32,325

THE KANSAS POWER COMPANY, *Appellant*, v. FAIRBANKS, MORSE AND COMPANY, THE CITY OF GLEN ELDER, AND CITY OFFICIALS, *Appellees*.

(45 P. 2d 872)

Opinion
filed June 8, 1935.

*Charles L. Hunt* and *Frank C. Baldwin,* both of Concordia, for the appellant.

*Leon W. Lundblade,* of Beloit, *Conrad H. Poppenhusen, Edward R. Johnston, Floyd E. Thompson, Lawrence A. Cole,* all of Chicago, Ill., *Justin D. Bowersock, Robert B. Fizzell* and *John F. Rhodes,* all of Kansas City, Mo., for the appellees.

*Clarence V. Beck,* attorney general, and *Theo. F. Varner,* assistant attorney general, for the State of Kansas, intervening appellant.

The opinion of the court was delivered by

DAWSON, J.: Plaintiff brought this taxpayer's suit under authority of the civil code (R. S. 60-1121) to enjoin the defendants from carrying into effect the terms of a contract for the purchase and sale of electric generating machinery for a municipal light and power plant which the governing body of the city of Glen Elder had decided to construct.

It appears that for some years past Glen Elder, a city of the third class, has owned an electric distribution system whereby it serves itself and the citizens of that town with light and power. The plaintiff supplies the electric energy to the city for these purposes. This arrangement has resulted in an average annual profit of $3,386.42 to the city for the last five years. Part of this profit from time to time has been transferred to the general fund of the city, with the consequent lightening of the ordinary burden of the taxpayers. At the time the challenged contract was executed between the city and Fairbanks, Morse and Company there was a balance of $5,250.62 in the city's light fund, which had largely been derived from profits on the sale of electricity to its inhabitants. The city itself, however, pays something into this fund out of its general revenue on some theory not important here.

In January, 1934, the governing officials of Glen Elder entered into a contract with Fairbanks, Morse and Company, to purchase engines and machinery for generating electric energy so that the city would have a complete municipal light and power plant of its own, and thus terminate its business relationship with the plaintiff. As the legality of this contract and the authority of the city to proceed under it constitute the vital question in this lawsuit, its significant features, much abridged, must be stated here.

In consideration of the delivery to the city by Fairbanks, Morse and Company, a manufacturer and purveyor of electric generating

machinery, of two Diesel engines of specified ratings, with the requisite alternators, exciters, switchboard, etc., the city agrees to pay to the company the sum of $17,185, on terms. Of this amount $4,000 is to be paid out of the light fund already on hand, and the balance in sixty monthly installments, to be evidenced by "revenue certificates" bearing interest at 6 percent, payment to begin in thirty days after the installation of the power machinery. In this contract the city likewise agrees:

(1) To construct a building to house the purchased machinery and to supply the needed common labor, cartage and materials therefor.

(2) When the machinery is installed, if the city desires a test of its efficacy, it shall request it. During such test "the engineer of the company shall be considered to be the agent of the municipality."

(3) The liability of the company is limited to replacement of defective parts of the machinery upon stipulated conditions. The company shall not be held responsible for damages of any character arising out of the use of said machinery or materials, either original or consequential, it being specifically agreed that the liability of the company is limited to replacement of defective parts of machinery.

(4) The title to the power machinery remains in the company until fully paid for, notwithstanding any judgment which may be taken against the city in the event of breach or dispute about this contract.

(5) The machinery shall also remain as personal property of the company, although it is emplaced and attached to realty; and the city shall pay the taxes thereon and keep the property insured for the benefit of the company.

(6) The "revenue certificates" which the city is to issue to evidence its obligations to the company for the balance of the purchase price are to be "not general obligations of the said municipality payable from taxes or its general funds but only special obligations payable from the net revenues of the plant." "Net revenues" under this contract are defined to be "the balance of the gross receipts of the municipality's light plant after the payment solely of the legitimate and necessary expenses of the operation of said plant."

(7) The city agrees to maintain rates which will produce sufficient revenues to pay its monthly obligations to the company "so far as it may be permitted to do so by law."

(8) The municipality agrees to operate said plant as a municipal plant until all obligations due under this contract have been fully discharged; and until such time shall not dispose of said plant in any manner so as to deprive the company of its title to or interest in said machinery or materials.

(9) Any delays or defaults on the part of the city will subject it to penalties of $12.50 per day plus expenses.

The gist of plaintiff's petition was that the contract was *ultra vires,* and to carry it into effect would impose an illegal burden of taxes upon it. It also set up a special interest in the contract by

virtue of its own contractual relationship to the city, and alleged that performance of the challenged contract would operate unlawfully to its prejudice.

The city's answer admitted the execution of the contract, denied any illegality in its terms, denied all intention to incur any illegal obligation which might result in a burden to the taxpayers, asserted its right to use the special fund on hand and the prospective revenues of the power plant to pay for the purchased machinery, and challenged plaintiff's capacity to bring the action.

Fairbanks, Morse and Company filed its separate answer joining issue with plaintiff on questions of law.

The evidence tendered by the litigants went in without material dispute of fact. The trial court held that plaintiff could not maintain the action, and otherwise ruled generally for defendants, and judgment was entered in their behalf.

At the outset of their brief defendants raised a question of the plaintiff's capacity to maintain the action—either as a taxpayer or on account of its personal interest in the present arrangement for furnishing the city with power and light. At the oral argument in this court, however, that question was waived, so that a possibly inconclusive result of this appeal might be avoided. To the same end the attorney general entered the name of the state as a party, so that a litigant of undoubted capacity to challenge the validity of the contract and the power of the city to make it is now in the case. This is an approved procedure. (*State v. Topeka,* 68 Kan. 177, 74 Pac. 647; *State, ex rel., v. Public Serv. Comm.,* 135 Kan. 491, 11 P. 2d 999; but see, also, *Stevenson v. Shawnee County,* 98 Kan. 671, 159 Pac. 5.)

A number of legal questions challenging this contract as a whole and certain of its details in particular are presented for our review. On behalf of defendants a zealous and painstaking effort is made to justify the contract and the judgment of the court sustaining it, notwithstanding some minor features of the contract which might not pass the scrutiny of this court. It is suggested that any such are severable from the contract without impairing its vital features.

Going at once to the main question: Had the mayor and councilmen of Glen Elder any statutory authority to obligate the city in the terms specified in the contract and the pertinent city ordinance?

Defendants cite R. S. 12-101 and R. S. 12-842 to justify their action. The first of these two is the one which confers in general terms

the familiar corporate powers enjoyed by cities of this state. Special power to establish a municipal light plant is no more conferred by this section than it is to establish a municipal grocery or a municipal filling station. That was decided in *State, ex rel., v. City of Coffeyville,* 127 Kan. 663, 667-668, 274 Pac. 258, where this particular section was unsuccessfully relied on by the city to justify the making of a contract to sublet its municipal airport.

The defendants quite properly rely on R. S. 12-842 as authority for the city of Glen Elder to embark on the business of constructing and operating a municipal light and power plant; and by the same authority the city may expand and extend whatever facilities of that character it may now possess. (*Hibbard v. Barker,* 84 Kan. 848, 115 Pac. 561.)

But do the provisions of this statute, fairly construed, authorize such a contract as Glen Elder and its governing officials have made with Fairbanks, Morse and Company to acquire the requisite facilities to provide the city with the desired light and power plant? The statute cited above had its inception in section 3 of chapter 136 of the Laws of 1903. It was amended in 1911 to read as it now appears in the revision of 1923. In 1903 the only statutory provision whereby the funds could be raised to establish a municipal light and power plant were those conferred by section 4 of the same act. That section provided that for "any and all indebtedness, *obligation or liability* contracted for or created" in the acquisition or purchase of a light and power plant, bonds of the city might be issued under prescribed regulations and limitations. The section descended into such directional details as that the contractor building the plant might be paid in bonds, bond maturities were prescribed, and annual installment issues were authorized. Nowhere in the statute of 1903 or elsewhere is the project of procuring a municipal light plant without a bond issue specifically sanctioned, doubtless for the reason that in 1903 the instances of a city's having sufficient funds available for such a purpose were so rare that it did not challenge legislative attention. And under R. S. 12-842, which is section 3 of chapter 136 of the Laws of 1903, as amended in 1911, if the city had the money on hand or in sight, it might be lawful to purchase, construct or acquire a power and light plant without a bond issue. Such an unusual situation apparently would permit a city government to embark on municipal ownership and operation of a light and power plant without a vote of the people—a result which probably the

legislature never anticipated. Be that as it may, where the city does not have the money, or the money in sight through a levy already lawfully made, it seems clear that section 4 of chapter 136 of the act of 1903, as revised in R. S. 12-843, is the proper course for the city to pursue. That section reads:

"That for any and all indebtedness, obligation or liability contracted for or created for any of the purposes mentioned in the preceding section, any such city, acting under the provisions thereof, is hereby granted full power and authority to issue bonds of the city to an amount equal to such indebtedness, obligation, or liability; the power to create or incur such indebtedness, obligation, or liability, and to issue bonds as herein provided, being independent of and in addition to like and other powers heretofore granted such cities; and such bonds may be sold as provided by law, and the proceeds thereof used in the payment of such indebtedness, obligation, or liability; such bonds shall not be used or sold except as directed by the governing body of said city, and such bonds shall not be issued to an aggregate amount exceeding fifteen per cent of the assessed value of such city as shown by the assessment last preceding the issuance thereof: *Provided,* That no bonds shall be issued except upon a vote of a majority of the qualified electors of such city: *And provided further,* That any such city shall have full power and authority to use any surplus arising from the proceeds of any such plant or plants for the purpose of bettering, constructing or installing any such plant that such city may have or may desire to acquire by construction or purchase."

Defendants contend that the method prescribed by this section for meeting "any and all indebtedness, *obligation* or *liability*" incurred in providing the city with a complete municipal light and power plant is not exclusive; and that the scheme to meet the obligations of the city to the vendor of the generating engines and related machinery in the sum of $17,185 by an issue of "revenue certificates" to be paid in monthly installments during the next five years is both lawful and feasible. The term "revenue certificates" is a new one in Kansas officialdom and has come into vogue along with other additions to our governmental nomenclature in recent years. There is express statutory sanction for the issue of "revenue" obligations payable out of earnings of municipal utilities and not out of taxes (Laws of 1933, Special Session, ch. 32; R. S. 1933 Supp. 12-805a *et seq.*), but it is not contended that the "revenue certificates" which Fairbanks, Morse and Company are to receive for their engines, etc., in this case are to be issued under the sanction of the act of 1933.

It seems clear to this court that since a specific method of financing the establishment of a municipal light and power plant is

prescribed by statute, and that statutory method gives no sanction to the proposed method of payment challenged in this action, the contract is illegal in its main features, and this court must so hold.

The diligence of counsel has brought together a plethora of cases from other jurisdictions which we have patiently perused; but all we need say about them is that if our own statutes were difficult to construe, or if we had a serious want of analogous decisions in our own reports, the cited cases from other jurisdictions so earnestly pressed on our attention would be very helpful; although, even among them, we would have to make a choice, for the industry of counsel for plaintiff has been no whit behind that of defendants in marshalling cases which hold that where governmental or corporate powers are conferred upon a municipality, the granted powers are exclusive, and no powers are impliedly conferred except those clearly necessary to the effective exercise of the powers expressly granted. That rule of law, however, is trite and familiar to the Kansas bench and bar. In the very first volume of our reports where this court was announcing the rule of law to which we have just referred, it said:

"The authorities . . . are too numerous and too well known to need citation." (*City of Leavenworth v. Norton,* 1 Kan. 432, 436.)

That the rule has lost none of its potency with the passing years may be noted in *City of Mankato v. Jewell County Comm'rs,* 125 Kan. 674, 676, 266 Pac. 96, where it was said:

"Cities in this state are municipal corporations created primarily for the purpose of local government. (Art. 12, § 5, Const.; R. S. 12-101.) They have only such power and authority as is specifically given them by the legislature, or those that are necessarily implied in the powers specifically given. (*City of Leavenworth v. Rankin,* 2 Kan. 357; *Beach v. Leahy,* 11 Kan. 23; *In re Pryor, Petitioner,* 55 Kan. 724, 728, 41 Pac. 958; *State v. Downs,* 60 Kan. 788, 792, 57 Pac. 962.)" (p. 676.)

The same rule applies to all governmental agencies, such as townships, school districts, drainage districts, and the state's own official boards. (*Salt Creek Township v. Bridge Co.,* 51 Kan. 520, 33 Pac. 303; *State, ex rel., v. Bradbury,* 123 Kan. 495, 256 Pac. 149; *State, ex rel., v. Kaw Valley Drainage District,* 126 Kan. 43, 267 Pac. 31; *State, ex rel., v. Regents of the University,* 55 Kan. 389, 401, 40 Pac. 656.)

Counsel for defendants seem to discern an analogy between the case at bar and the one where the purchase of the privately owned

waterworks plant which served the city of Topeka and which was covered by a mortgage was purchased by the city pursuant to a popular vote. Included in the contract of purchase was the assumption of the mortgage which the city agreed to pay. (*State v. Topeka*, 68 Kan. 177, 74 Pac. 647.) Nothing is more clear in the statute (R. S. 12-842) than the grant of authority to the city to purchase a privately owned utility serving the city. And it is a matter of common knowledge that such utilities are financed by loans, which the property is pledged to secure; and fractional interests in such a loan, commonly called corporation bonds, occasionally called debentures, are sold to and held by the investing public. And so, if a city decides to purchase the utility which serves it, it will almost invariably follow that the bonded indebtedness, or mortgage indebtedness, on the utility will have to be assumed by the city. The alternative, not ordinarily a just one, would be to ignore the existing utility entirely when its franchise expires, and construct another one.

Another case to which our attention is called is *Carleton v. City of Washington*, 38 Kan. 726, 17 Pac. 656, where it was held that the city could purchase fire-fighting apparatus and provide payment therefor by issuing warrants payable in the future. The case is easily distinguishable from the one at bar. Protection of a city against fire is a governmental concern; the acquisition of a municipal light plant is the city's proprietary concern. The case was decided in 1888. Since that time the legislature has enacted various statutes to curb the natural predeliction of city officials to spend money they do not have. (R. S. 15-412; R. S. 1933 Supp. 79-2925 *et seq.*; id. 10-1101 *et seq.*) We have not overlooked section 16 of the "cash-basis" act, R. S. 1933 Supp. 10-1116, but hold that the "revenue certificates" which defendants propose to issue to Fairbanks, Morse and Company in this case do not fall within the exemptions therein specified. Touching the scope of R. S. 14-401, the court holds that the grant of powers therein enumerated are governmental; they confer no proprietary powers. The latter are conferred by R. S. 12-842 and other specific statutes of similar import.

Counsel for appellees contend for a liberal construction of the city's powers in this case because the acquisition of a municipal light plant is the concern of the city in its proprietary capacity, not its governmental capacity. Mayhap there are situations where

more liberality of construction of corporate powers may be judicially sanctioned in the one situation rather than the other. But in the case we have to consider, the city's "proprietary" capacity had to find its authority in some statute, and it must function in its proprietary capacity in conformity with and not at variance with the mode the statute prescribes.

In view of this conclusion some features of the contract which are vigorously assailed by plaintiff and as vigorously upheld by the defendants do not require to be scrutinized with judicial particularity at this time.

The judgment is reversed and the cause remanded with instructions to enter judgment in plaintiff's behalf.