NEWLIN MACHINERY CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 63750.   Filed June 28, 1957.

*John A. Ross, Esq.*, for the petitioner.
*Ray H. Garrison, Esq.*, for the respondent.

OPINION.

HARRON, *Judge:*

### *Issue 1.   Tax-Exempt Interest.*

Petitioner sold heavy machinery and related equipment to political subdivisions in the States of Missouri and Kansas. In some instances, the municipalities entered into lease agreements in order to pay the purchase price, or unpaid portion thereof, in semi-annual installments over a period of years. Petitioner claimed in its returns for the fiscal years ended June 30, 1952 and 1953, that receipts by these political subdivisions in the amounts of $7,934.92 and $5,102.25, respectively, constituted tax-exempt interest within the meaning of section 22 (b) (4), 1939 Code.

Respondent now concedes that, of the above-stated amounts, $1,-717.33 and $1,449.21, received during fiscal years ended in 1952 and 1953, respectively, have been properly excluded as tax-exempt interest. As to the remaining amounts, i. e., $6,217.59 for the fiscal year ended in 1952, and $3,653.04 for the fiscal year ended in 1953, respondent makes the following contention: The contracts under which the above amounts were paid to petitioner do not call for the payment of

interest, and such contracts, even if providing for interest, are void by reason of the Kansas budget and cash-basis laws. Kans. Gen. Stat. secs. 10–1101 to 10–1122, 79–2935 (Corrick 1949). Respondent contends that, in either case, petitioner is precluded from treating the amounts in issue as tax exempt under section 22 (b) (4).

Section 22 (b) (4) provides that "interest" upon the "obligations of a State, Territory, or any political subdivision thereof" shall be exempt from taxation. The usual meaning ascribed to the word "interest" is "the amount which one has contracted to pay for the use of borrowed money." *Old Colony Railroad Co.* v. *Commissioner*, 284 U. S. 552; *H. Gates Lloyd*, 4 T. C. 829, affd. 154 F. 2d 643. It is apparent, therefore, that for petitioner to succeed in its attempt to treat the amounts received from political subdivisions as tax-exempt interest, it must prove that the subdivisions "contracted to pay" such interest.

Respondent, on this point, has introduced into evidence carefully prepared exhibits breaking down all the transactions out of which petitioner claims to have received tax-exempt interest into two groups: (1) Those transactions not evidenced by any signed written obligation that, on its face, provided for a political subdivision to pay interest; and (2) those transactions where signed purchase orders did provide on their face for the payment of interest. Of the amounts in dispute, $3,390.66 and $2,618.23 for fiscal years ended in 1952 and 1953, respectively, fall into the first category. The only evidence purporting to show that interest was received by petitioner in the first category are entries in petitioner's books to an account entitled "interest earned from municipalities."

Petitioner does not dispute the information supplied by respondent's exhibits. Petitioner apparently contends that it is not necessary that an obligation to pay interest be set forth specifically, with definite rates and terms of interest; but that it is sufficient for petitioner to show that its policy was to charge 6 per cent interest with respect to all of its lease agreements, and that interest was predetermined and lumped together into the one figure finally inserted into the lease agreements.

We are of the opinion that petitioner's contention is without merit. The case of *Kurtz Bros.*, 42 B. T. A. 561, is dispositive of it. In the above-cited case, petitioner sold school supplies to political subdivisions in the State of Pennsylvania on open account. Some of these accounts fell past due, and petitioner invoiced these subdivisions with interest charges. We held that the interest charges collected by petitioner were not tax exempt under section 22 (b) (4), because there was no interest paid upon "the obligations of a State, Territory, or any political subdivision thereof." We stated (at page 565):

"There is no evidence that any of these townships or school districts had executed in the exercise of their borrowing power any written agreement with petitioner that they would pay interest on their past due accounts. * * * The word 'obligations' as used in the statute, we think, means some kind of a written instrument executed by the state or a political subdivision thereof, in the exercise of its borrowing power. The statute was intended to exempt from taxation interest paid upon such an obligation."

As to the amounts of $3,390.06 and $2,618.23 received in fiscal years ended 1952 and 1953, respectively, there is no evidence that any of the political subdivisions executed, in the exercise of their borrowing power, any binding written agreement with petitioner that they would pay interest on the unpaid balances due. The purchase orders contain no provision for interest. The lease agreements contain no reference to the term "interest." None of the rental invoices refer to the term "interest." In addition, the public records of the political subdivisions involved apparently contain no entries reflecting the payment of "interest" to petitioner. Accordingly, it is held that petitioner has failed to establish that these amounts are interest, *Kurtz Bros.*, *supra*, and that they cannot be excluded from petitioner's income for the taxable years as exempt from tax.

Having held that the amounts received by petitioner attributable to transactions evidenced by no signed written obligation to pay interest are not tax exempt, the issue is narrowed down to the remaining amounts; i. e., $2,827.53 and $1,034.81 for fiscal years ended in 1952 and 1953, respectively. Respondent concedes in his exhibits that these amounts are attributable to transactions evidenced by signed purchase orders providing for interest payments.

Were respondent solely to contend that the signed purchase orders were not "obligations" within the meaning of section 22 (b) (4), the question could be quickly decided on the basis of past authority. It is now fairly clear that Congress did not intend to limit the exemption for interest on obligations of a State subdivision to the interest on some particular form of obligation. *Commissioner* v. *Meyer*, 104 F. 2d 155. The exemption is just as applicable to an obligation evidenced by an ordinary written agreement of purchase and sale, in which the political subdivision agrees to pay interest. *Kings County Development Co.* v. *Commissioner*, 93 F. 2d 33; *Fairbanks, Morse & Co.* v. *Harrison*, 63 F. Supp. 495.

The respondent, however, has made the following argument: The purchase contracts involved here (involving only political subdivisions of Kansas), even if they provided for the payment of interest, do not constitute an "obligation" of the political subdivisions, since such contracts are void by reason of State law; i. e., the Kansas budget and cash-basis laws. Kans. Gen. Stat. (Corrick 1949), *supra*.

The Kansas budget and cash-basis laws were enacted in 1933, at the same session of the legislature. These laws have the same "common, basic purpose, namely, the systematical, intelligent and economical administration of the financial affairs of the municipalities and other taxing subdivisions of the state, so as to avoid waste and extravagance." *State* v. *Board of Commissioners of Republic County*, (Kans. 1938) 82 P. 2d 84, 88; *Shouse* v. *Board of Commissioners of Cherokee County*, (Kans. 1940) 99 P. 2d 779, 782, affirmed on rehearing (Kans. 1940) 102 P. 2d 1043. These laws were enacted, according to the Kansas Supreme Court, in order "to curb the natural predilection of city officials to spend money they do not have." *Kansas Power Co.* v. *Fairbanks, Morse & Co.*, 45 P. 2d 872.

The budget law for local governments in Kansas provides for preparation, submission to public hearing, and adoption of a budget showing prospective revenues and expenditures for the ensuing year. It prohibits, in general, tax levies beyond that required to raise funds sufficient to meet the budgeted items of expenditure, and makes unlawful the creation of indebtedness in excess of the annual budget. Kans. Gen. Stat. secs. 79–2925 to 79–2937 (Corrick 1949).

The cash-basis law forbids the creation by local units of government of any indebtedness in excess of the funds actually available for meeting it. Kans. Gen. Stat. secs. 10–1101 to 10–1122 (Corrick 1949). "Broadly speaking, it is designed to have such governmental units operate their respective functions on a cash basis—not to spend money they do not have, or incur obligations they cannot meet promptly." *State* v. *Board of Education of Topeka*, 21 P. 2d 295. The cash-basis law provided for "a new course of business administration" for local governments, and, at least "in some respects" required "a radical departure" from former practices. *Drum* v. *French*, (Kans. 1933) 25 P. 2d 579, 580.

Under the new legislation, the governing body of each local government was required to pay off and discharge all of the indebtedness of such government in order that it might operate, after May 1, 1933, "on a cash basis without other indebtedness or liabilities except that covered by bonds." *State* v. *Board of Education of Topeka, supra*, at 298. Each local government was required to issue bonds to fund the claim or claims outstanding on the effective date of the cash-basis law.

We have considered respondent's contention carefully, but after studying the transactions here involved, as well as the allegedly applicable State law, we cannot uphold respondent's position. Respondent, to support his contention, asks us to hold that the political subdivisions of Kansas, which bought machinery from petitioner on the installment basis, acted unlawfully under the above-discussed

local law. Respondent has offered practically no evidence on this point, except that certain accounting officers of the political subdivisions refused to certify that "funds for meeting the obligation" were on hand, and some vague and inconclusive testimony by one city clerk and two county clerks as to what the public policy was regarding installment purchases by political subdivisions under the Kansas cash-basis law. Respondent has not introduced into evidence anything specifically showing that the political subdivisions did indeed violate the Kansas law. Instead, respondent maintains that once having made his determination, petitioner must prove the legality of the disputed transactions.

Respondent is incorrect. While his determination is prima facie correct, the presumption is in petitioner's favor that the transactions which it entered into with the political subdivisions complied with the law. *Washington Post Co.*, 10 B. T. A. 1077; cf. *W. H. Weaver*, 25 T. C. 1067. Furthermore, the position of this Court has consistently been that where contracts are fully executed, and no fraud exists, the rights of the parties which have been established by the contracts will be given effect. Cf. *Frances M. Camp*, 21 B. T. A. 962; *J. N. Wheelock*, 16 T. C. 1435; *Joseph S. Finch & Co.*, 23 B. T. A. 1152.

We hold, therefore, that the amounts of $2,827.53 and $1,034.81 received in fiscal years ended in 1952 and 1953, respectively, were interest payments evidenced by purchase orders making provision for payments of interest which the political subdivisions thereby became obligated to pay; and these amounts are exempt from tax within the meaning of section 22 (b) (4). *Commissioner* v. *Meyer, supra; Kings County Development Co.* v. *Commissioner, supra; Fairbanks, Morse & Co.* v. *Harrison, supra.*

### Issue 2. Bad Debt Reserve.

The remaining issue presents the question of what constituted the proper allowances for additions to petitioner's reserve for bad debts for each of the taxable years. Petitioner claims that it is entitled to allowances for additions to the reserve for bad debts in the amounts of $20,000 and $15,301.44, respectively, for each of the taxable years. Respondent has allowed only $7,302.44 and $4,285.01, respectively, as the proper additions to the reserve.

After carefully examining all the evidence, it is held that respondent's determinations are correct. A taxpayer's election to use the reserve method provided in section 23 (k) (1), 1939 Code, subjects him to the Commissioner's reasonable exercise of his discretion. The statutory provision, in referring to the discretion of the Commissioner, has placed strong emphasis upon the presumption that the Commissioner's exercise of his discretion in allowing or disallowing an addi-

tion to a bad debt reserve is reasonable. In any event, the Commissioner's determination is prima facie correct and the taxpayer has the burden of proving error. *C. P. Ford & Co., Inc.*, 28 B. T. A. 156, 158, 159; *Union National Bank & Trust Co. of Elgin*, 26 T. C. 537.

From the testimony, it appears that petitioner's officers added $20,000 and $15,321.44 to the reserve for bad debts for the fiscal years ended in 1952 and 1953, respectively, more or less arbitrarily, because they thought that the reserve for bad debts should be increased to meet the considerable increase in petitioner's accounts receivable in 1952 and 1953. However, the evidence shows that using respondent's method of computation, the amount in petitioner's reserve was more than adequate to meet the increased amounts charged against the reserve in the years 1952 and 1953. The standard by which respondent's determination must be judged is whether petitioner's reserve itself was sufficient to absorb the bad debts that might arise. *Krim-Ko Corporation*, 16 T. C. 31. In the light of petitioner's experience, the evidence before us does not show that the reserve would be insufficient under respondent's determination. Therefore, we are unable to conclude that his determination was either arbitrary or represented abuse of discretion. Respondent's additions to petitioner's bad debt reserve for the fiscal years ended in 1952 and 1953 are sustained.

Due to various concessions and adjustments, a Rule 50 computation is necessary.

*Decision will be entered under Rule 50.*