## J. Robert King, Jr., and Virginia S. King, Petitioners v. Commissioner of Internal Revenue, Respondent

Docket No. 1273–79.    Filed November 17, 1981.

*Glenn A. Rosenbaum, John G. Heard,* and *Thomas P Marinis, Jr.,* for the petitioners.

*Evelyn B. Brennan* and *William D. Peltz,* for the respondent.

Featherston, *Judge*: Respondent determined the following deficiencies in petitioners' Federal income taxes:

| Year | Amount |
| --- | --- |
| 1971 | $17,492 |
| 1972 | 4,941 |
| 1973 | 7,791 |
| 1974 | 4,108 |

The issue for decision is whether the interest, or any portion thereof, received by petitioner Virginia S. King on warrants issued to her by the Trinity River Authority is excludable from income for the years in controversy under section 103(a)(1).[1]

### FINDINGS OF FACT[2]

Petitioners J. Robert King, Jr., and Virginia S. King, husband and wife, were legal residents of Texas when they filed their petition. They filed their joint Federal income tax returns for 1971, 1972, 1973, and 1974 with the District

---

[1]All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.

[2]Although the record is stipulated, it includes the depositions of certain witnesses. The parties have raised issues as to the credibility of some of the testimony, and, accordingly, formal findings of fact are made.

Director of Internal Revenue, Austin, Tex. J. Robert King, Jr., is a petitioner only because of his community interest in the income in question and his filing joint returns with his wife. Accordingly, Virginia S. King will hereinafter be referred to as petitioner.

Prior to May 29, 1969, petitioner owned an undivided one-fourth interest in 4,928.35 acres of land known as the Smither Farm. Petitioner's interest, together with the interests of the other coowners, was managed by E. M. Smither Co., a partnership. On or about October 29, 1968, the E. M. Smither Co. received a letter from the Trinity River Authority of Texas (TRA) making an offer to purchase the Smither Farm for $1,861,471. The letter stated that TRA's Lake Livingston reservoir project would require 21.94 acres in fee simple and a flowage easement of 2,309.52 acres.[3] The letter further stated that "it has been suggested that we attempt to acquire the 4,928.35 acres of land in its entirety" to solve a problem with respect to land for the Ellis Prison Unit of the Texas Department of Corrections.

TRA, a political subdivision of the State of Texas, is charged with developing the soil and water resources of the Trinity River watershed in east Texas. One of its projects was the construction of Lake Livingston, a reservoir intended primarily to supply water to the City of Houston, Tex. The project was financed by a bond issue of $50 million. Part of these funds were later used for the purchase of land within the lake site.

Consistent with the letter of October 29, 1968, the purpose of the acquisition of the Smither Farm by TRA was twofold: (1) TRA's Lake Livingston construction project required the acquisition of 22.14 acres in fee simple for reservoir purposes and 2,316.03 acres in flowage easements; (2) the remaining 2,590.18 acres were needed to provide TRA with land suitable for trade to the Texas Department of Corrections for lands in the Ellis Prison Unit which were to be subjected to flooding as a result of the construction of Lake Livingston.

TRA had the power of eminent domain with respect to the 22.14 acres required for reservoir purposes and with respect to

---

[3]Subsequent surveys resulted in a revision of these acreage figures; 22.14 acres in fee simple and 2,316.03 acres in flowage easements were required by TRA.

the flowage easement over the 2,316.03 acres.[4] TRA did not have the power of eminent domain over the remaining 2,590.18 acres of land to be traded to the Texas Department of Corrections or the fee interest in the 2,316.03 acres of land to be covered by a flowage easement. Had petitioner and the other coowners of the Smither Farm refused to accept TRA's offer of October 29, 1968, TRA would have restricted its purchase to that portion of the Smither Farm that was subject to TRA's power of eminent domain—that is, 22.14 acres of land and a flowage easement over 2,316.03 acres of land.

On or about May 29, 1969, petitioner and the other coowners, after oral negotiations, agreed to sell the Smither Farm to TRA for a consideration of $2,112,048.70. The consideration was to be composed of cash in the amount of $122,048.70 and warrants issued by TRA in the total amount of $1,990,000 bearing interest at the rate of 6.5 percent per annum. Petitioner's share of the cash was $33,637.19; her share of the warrants was $490,000, consisting of one warrant for $90,000 and four warrants for $100,000 each. Petitioner designated the combination of cash and warrants she was to receive as well as the payment schedule for the warrants. In her income tax returns, petitioner reported her gain on the sale of her land on the installment basis provided by section 453.

The warrants were issued pursuant to a resolution passed by TRA's executive committee on September 27, 1966, and approved by TRA's board of directors on October 21, 1966. That resolution authorized the Livingston Project Administration Committee to negotiate for the purchase of land on terms calling for payment of a portion of the price in cash and the delivery of negotiable interest-bearing warrants for the balance. Immediately upon issuance of a warrant, TRA was to deposit a sum of money equal to the face amount of the warrant in a special account (hereinafter sometimes referred to as the Southwest account) with the First Southwest Co. of Dallas, Tex., styled "First Southwest Company, agent, Trinity River Authority of Texas (Livingston Project) Land Acquisi-

---

[4]See Tex. Rev. Civ. Stat. Ann. art. 8280–188 (Vernon 1960).

tion Escrow Account." Interest earned on the account was to be used to pay the interest on the warrants and the cost of administering the fund, and the balance was to be returned to TRA. Other than the resolution, no written agreements governing the rights of the parties were executed by them with respect to the account.

In an opinion dated January 9, 1967, prepared by counsel for TRA and addressed to the project manager of TRA, the following statement is made concerning the effect of the resolution:

> As I understand the Resolution, the Escrow Agreement and the Deferred Certificates, the First Southwest Company is acting as agent for the Trinity River Authority in investing funds set aside to make the deferred payments and in servicing the outstanding warrants. However, the Trinity River Authority is primarily liable for payment of the certificates issued to the landowner even in case of default by the First Southwest Company.
>
> The funds in the escrow account of the agent are the legal property of the Trinity River Authority, as principal, until paid out by the agent at the maturities of the certificates.

An opinion dated January 22, 1968, prepared by counsel for TRA and addressed to the project manager, contains the following statement regarding the nature of the obligations created by the warrants:

### III.

### Are the warrants issued by the Trinity River Authority obligations of the Trinity River Authority?

> Warrants issued by the Trinity River Authority in its program of land acquisitions for the Lake Livingston Project are special, secured obligations of the Trinity River Authority. The resolution of the Board relating to the purchase of land by warrants requires that "immediately upon execution and delivery of any warrant under the provisions of this resolution the administrative committee shall cause to be transferred an amount of money equal to the face amount of such warrant to a special account with the First Southwest Company of Dallas, Texas, styled 'First Southwest Company, agent, Trinity River Authority of Texas (Livingston Project) Land Acquisition Escrow Account.' " The form of warrant recommended herein above would show on its face that it is a special obligation—payable out of a particular fund. The terms of the resolution require that the warrants be secured by deposit to the fund "immediately" after delivery of any warrant.

Amounts deposited in the Southwest account by TRA were listed as assets on its financial statements. Correspondingly,

unpaid and outstanding warrants were listed on TRA's financial statements as liabilities.

The issuance of the warrants permitted the landowners to report their gains from sales to TRA on the installment basis under section 453. TRA's purposes in issuing the warrants, as conceived by its management, were to facilitate the land acquisition through increased flexibility in negotiations with the landowners, thereby reducing the cost of land acquisition, and to earn interest on the money through investment of funds in the Southwest account.

During 1971, 1972, 1973, and 1974, petitioner received $33,692, $9,750, $13,686, and $6,500, respectively, from TRA as interest on the warrants outstanding during each of those years, and petitioners excluded the interest from gross income for Federal income tax purposes. Respondent determined that the warrants do not qualify as obligations for which interest is excludable under section 103, and he increased petitioners' taxable income accordingly.

## OPINION

Petitioner contends that the interest which she received on the warrants issued by TRA as part of the consideration for the purchase of her land is exempt from Federal income taxes as interest on "obligations" of a "political subdivision" of Texas within the meaning of section 103(a)(1). Respondent contends that the warrants were not issued by TRA in the exercise of its borrowing power, but as a method of making payment for the land from funds already borrowed, and that, therefore, the interest on the warrants is not excludable from her gross income under section 103(a)(1).

Section 103(a)(1)[5] in broad terms provides that the "gross income" of a taxpayer does not include "interest" on the "obligations" of "any political subdivision" of a State. It is stipulated that TRA is a political subdivision of the State of Texas, and it is clear that the warrants were "obligations" of TRA. But not every obligation is covered by the exemption

[5]SEC. 103. INTEREST ON CERTAIN GOVERNMENTAL OBLIGATIONS.

(a) GENERAL RULE.—Gross income does not include interest on—

(1) the obligations of a State, a Territory, or a possession of the United States, or any political subdivision of any of the foregoing, or of the District of Columbia; * * *

prescribed by section 103(a)(1). Rather, the interest exclusion reflects a longstanding policy of the Federal Government to avoid imposing burdens or restraints on the exercise by the States and their political subdivisions of their power to borrow funds. The "purpose of the exclusion is to permit state and local governments to obtain capital at a low rate of interest." *Fox v. United States*, 397 F.2d 119, 122 (8th Cir. 1968); see also *Helvering v. Stockholms &c. Bank*, 293 U.S. 84, 87 (1934). Interest is not excludable under section 103(a)(1) unless the obligation is incurred in the exercise of the political subdivision's borrowing power.

The path to the decision as to whether the warrants here in issue were "obligations" within the meaning of section 103(a)(1) has been illuminated by *Drew v. United States*, 551 F.2d 85 (5th Cir. 1977), which also involved warrants issued by TRA in connection with the Lake Livingston project. In that case, the taxpayer owned land within the project site and was informed, along with other similarly situated landowners, of TRA's power of eminent domain. When TRA was unable to reach agreement with a landowner, condemnation proceedings were instituted. The taxpayer reached agreement with TRA on the sale of his land, elected to receive the consideration in the form of cash and warrants, and argued that the interest on the warrants was nontaxable under section 103(a)(1). The Court of Appeals, affirming a decision by the District Court, held that interest on the warrants was not excludable from the taxpayer's income because the interest was part of the award paid for the land under a threat of condemnation and not in a voluntary lending-borrowing transaction.

In reaching its conclusion, the Court of Appeals in *Drew* stated (551 F.2d at 87–88):

It is evident that the obligation incurred by the governmental agency in condemnation award cases is under its power of eminent domain and not in the exercise of its borrowing power. The distinguishing feature between condemnation award cases and those in which the exemption is allowed, e.g., where the Government floats bonds or securities, is the involuntary nature of the condemnation cases.

In this connection, the *Drew* court quoted (551 F.2d at 88) from *United States Trust Co. of New York v. Anderson*, 65 F.2d 575, 578 (2d Cir. 1933), where it is pointed out that State and

municipal bonds, if tax exempt, will command a better price in the market than if they are subject to taxation—

"because the purchaser is not compelled to buy them and, being a free agent, may be induced by the tax exemption feature to prefer them to private bonds for investment. It disregards the whole purpose of the exemption to apply it to interest upon obligations of a state which it can *compel* a citizen to take in exchange for the fair value of his property."

See also *Holley v. United States*, 124 F.2d 909, 910 (6th Cir. 1942).

The Court of Appeals in *Drew* distinguished, but accepted as correct, the decisions of the Ninth Circuit in *Kings County D. Co. v. Commissioner*, 93 F.2d 33 (9th Cir. 1937), revg. a Memorandum Opinion of this Court, cert. denied 304 U.S. 559 (1938), and the Second Circuit in *Commissioner v. Meyer*, 104 F.2d 155 (2d Cir. 1939), affg. a Memorandum Opinion of this Court. Both of those cases held that the interest received on obligations incurred in the purchase of land by municipalities in voluntary, negotiated transactions was exempt from tax. The *Drew* court stated (551 F.2d at 89):

Unlike the taxpayers in *Meyer* and *Kings County,* taxpayers in the present case had no alternative but to sell their property to TRA because of the Authority's [TRA's] power of eminent domain. Although this is not in the strict sense a condemnation award case, and the District Court did not so hold, the analogy is persuasive. It is undisputed that taxpayers conveyed their land to TRA under the threat of condemnation. * * *

The Court of Appeals in *Drew* added (551 F.2d at 89):

The manner in which the purchases were made was at the suggestion of and for the benefit of the landowners. The fact that TRA allowed them and other landowners to elect to receive compensation on a deferred basis, and thereby to obtain the additional tax advantage of installment reporting, did not convert the transaction into a voluntary one. * * * [Fn. ref. omitted.]

Judge Brown, in a concurring opinion, stated (551 F.2d at 89) that he agreed fully with the court's opinion, but emphasized "that this decision is for this day and train only."

We think the reasoning of *Drew* quite clearly denies the section 103(a)(1) interest exclusion claimed by petitioner in connection with the consideration received for the portion of the Smither Farm—the 22.14 acres of land and the flowage easement over 2,316.03 acres—that was subject to condemnation. The parties have stipulated that $465,361.24 represents the portion of the total consideration attributable to this land

and easement which were acquired by TRA on terms and in circumstances basically similar to the properties involved in the *Drew* case. The interest on the warrants to the extent attributable to these properties was part of the just compensation for the properties sold under a threat of condemnation[6] and is not excluded from petitioner's income by section 103(a)(1).

With respect to the properties which were not subject to condemnation—the 2,590.18 acres of land and the fee interest in the 2,316.03 acres covered by the flowage easement—we think the opposite answer is required. The parties have stipulated that the owners "were under no legal obligation to sell" these properties to TRA. They have also stipulated:

Had Petitioner and the other owners of the Smither Farm refused to accept the offer of * * * [TRA] as outlined in the letter dated October 29, 1968, the * * * [TRA] would have restricted its purchase of the Smither Farm to that portion that was subject to * * * [TRA's] power of eminent domain—that is, 22.14 acres of land and a flowage easement over 2,316.03 acres of land.

The properties not subject to condemnation were thus acquired in a voluntary transaction. The portion of the consideration attributable to them represented payments on contracts or warrants calling for interest on deferred payments. We think the interest on the warrants, to the extent that they are attributable to these properties, is excludable from petitioner's income under section 103(a)(1).

The facts with respect to this part of the instant transaction are analogous to those in *Commissioner v. Meyer, supra,* and *Kings County D. Co. v. Commissioner, supra.* In the *Meyer* case, for example, the taxpayer sold land to a village in consideration of cash and interest-bearing promissory notes. The Commissioner argued that the interest on the promissory notes was not excludable under the predecessor of section 103(a)(1) on the theory that the notes were not executed in the exercise of the village's borrowing power like bonds duly authorized, issued, and sold for the purpose of borrowing

---

[6]As pointed out in the findings of fact, TRA's letter of Oct. 29, 1968, to petitioner stated that the Lake Livingston project would "require" the 22.14 acres of land and the flowage easement. The threat of condemnation was clear. The letter further stated that "it has been suggested that we attempt to acquire" the remainder. Thus, the distinction between the property which was subject to the power of eminent domain and that which was not was carefully observed from the beginning.

money. The Court of Appeals rejected this argument, stating (104 F.2d at 156–157):

Where credit is obtained in consideration for a promise to pay money in the future, together with interest on that money, there is no valid ground for making a distinction between interest paid on bonds duly issued and interest paid on notes duly delivered. * * * If * * * the taxpayer had advanced the money to the village on its notes and the village had bought the property directly there would have been a patent exercise of the borrowing power. * * * The practical effect of what it did from the standpoint of its borrowing power was the same when it [the village] gave its interest bearing notes for property instead of for cash. * * *

Similarly, in *Newlin Machinery Corp. v. Commissioner*, 28 T.C. 837, 842 (1957), purchase orders covering machinery bought·by a municipality and calling for the payment of interest were held to create obligations within the meaning of the predecessor of section 103; the Court stated that Congress did not limit the exemption to some particular form of obligation, explaining that it is "applicable to an obligation evidenced by an ordinary written agreement of purchase and sale, in which the political subdivision agrees to pay interest." See also *Fairbanks, Morse & Co. v. Harrison*, 63 F. Supp. 495, 509–512 (N.D. Ill. 1945); *In re General Indicator Corp.*, an unreported case (E.D. Wis. 1969, 23 AFTR 2d 69–1418, 69–2 USTC par. 9484). In fact, in *Drew v. United States, supra* at 88, the Court of Appeals stated that it agreed with the taxpayer that "Section 103 is not limited to interest paid on obligations evidenced by some particular form of instrument or incurred in some particular form of transaction."

In the instant case, TRA contracted to buy that portion of petitioner's land not subject to condemnation in a voluntary transaction and, as part of the consideration for the contract of purchase and sale, gave interest-bearing warrants. Paraphrasing the statement in *Commissioner v. Meyer, supra*, quoted above, there is no valid ground for making a distinction between interest paid on bonds duly issued and interest paid on warrants duly given. The use of the warrants in lieu of paying cash for the land facilitated negotiations for the purchase of the land, enabled TRA to obtain the maximum return for its outlay of public funds, and incidentally gave TRA the benefit of the interest spread between the rate paid by Southwest and the rate received by petitioner.

The mere fact that TRA had funds available to pay the full

price of the land does not, in our view, mean that issuance of the interest-bearing warrants was unrelated to TRA's borrowing power, i.e., to the purchase of the land on the credit of TRA. In *Marsh Monument Co. v. United States*, 301 F. Supp. 1316, 1320 (E.D. Mich. 1969), where interest was included in the contract price of drain orders, the court stated:

> Defendant's argument, that the Drain Commissioner could have paid off the drain orders immediately and still would have to pay the full invoice price, is not germane. The 6% charge was the price for the *right* to defer payment for one year, and as such was a premium paid for forbearance from collecting an obligation, commonly known as "interest." * * * [Fn. ref. omitted.]

Similarly, the interest paid on the warrants gave TRA the *right* to defer part of the payment to petitioner even though it had funds on hand which it could have used to pay cash for the land.

It is true that issuance of the warrants accommodated petitioner and the other sellers of the land by permitting them to report their gains on the installment basis under section 453. Significantly, respondent has recognized the viability and effectiveness of the warrants for this purpose. The arrangement also served the interests of TRA in the manner described above. But we find nothing in the use of the warrants with these results that is inconsistent with section 103(a)(1). There is nothing in section 103(a)(1) which requires a political subdivision to exhaust its funds, whether borrowed or obtained from other sources, as a condition to issuing an interest-bearing obligation for the purchase of land. Nor does the fact that TRA's acquisition of petitioner's land through use of the warrants involved two borrowings rather than one alter the result. Certainly, had the purchase contract involving use of the warrants preceded the issuance of the bonds, the interest on the purchase contract would have met the section 103(a)(1) requirements. *Commissioner v. Meyer, supra*. We do not think the result is affected by the order in which the two borrowing transactions occurred.

Respondent argues that money was placed in escrow to pay the warrants when they became due and that, for this reason, issuance of the warrants did not involve an exercise of TRA's borrowing power. But it is not at all clear that the deposit of funds in the Southwest account was an escrow arrangement.

The legal concepts employed in the resolution are somewhat mixed. Our findings, however, contain excerpts from opinions of TRA's counsel which conclude that the funds in the account were TRA's property, that Southwest was the agent of TRA, that TRA remained liable to the landowners for payment of the purchase price, and that the warrants were "special, secured" obligations of TRA. We think it clear that the account served as a kind of security for the payment of the warrants in that the funds in it were earmarked for use for that purpose. TRA's deposit of funds in the account was the method it chose for funding the payment of the warrants. By accepting the warrants, petitioner did not release any right she had to have TRA pay for the land. Neither the warrants themselves nor the resolution authorizing their issuance limits the landowners to be paid only from that account. TRA remained liable for the payment of the warrants regardless of what happened to the Southwest account.[7]

In an attempt to support the view that the nature of the Southwest account disqualifies the interest on the warrants from exemption under section 103(a)(1), respondent makes much of the following language in the penultimate paragraph of the *Drew* opinion (551 F.2d at 89):

The transaction imposed no burden upon TRA, it was not in need of funds to purchase the land involved. The necessary money had already been acquired through its initial bond issue. * * * [Fn. ref. omitted.]

This language, however, is in the middle of a paragraph in which the *Meyer* and *Kings County* cases, involving voluntary transactions, are distinguished from the facts in the *Drew* case. The paragraph concludes that neither permitting the landowners to elect to receive warrants in lieu of immediate cash nor the fact that TRA realized a profit on the Southwest account deposit converted the transaction for the acquisition of the taxpayer's land into "a voluntary one." The closing paragraph of the opinion refers to the "factual similarities

---

[7]Although we think TRA remained liable to petitioner for payment of the warrants regardless of what happened to the Southwest account, we note that bonds issued by municipalities have been held to be within sec. 103(a)(1) or its predecessors even though payment was to be made out of special funds and the general credit of the municipalities was not pledged. See, e.g., *Commissioner v. Shamberg's Estate*, 144 F.2d 998, 1006 (2d Cir. 1944), affg. 3 T.C. 131 (1944), cert. denied 332 U.S. 792 (1945); *Commissioner v. Pontarelli*, 97 F.2d 793, 795 (7th Cir. 1938), affg. 35 B.T.A. 872 (1937).

between this case and *Anderson* and *Holley, supra*," both involving interest paid on condemnation awards. Thus, we think respondent's reliance on the above-quoted language is misplaced.

We do not think the fact that TRA had funds to deposit in the Southwest account—whether those funds were derived from the sale of bonds or from interest on other Southwest deposits—alters the fact that TRA's purchase of petitioner's land which was not subject to condemnation was accomplished through an extension by petitioner of credit to TRA as evidenced by the warrants—an exercise of TRA's borrowing power. We conclude, therefore, that interest on the portion of the warrants attributable to the purchase of the land which TRA did not have authority to condemn is excludable under section 103(a)(1).

To reflect the foregoing,

*Decision will be entered under Rule 155.*